IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| THOMAS L. MASON, M.D., | ) | |
| STEVEN G. FOLSTAD, M.D., | ) | CIVIL ACTION NO.: 3:10CV472 |
| and | ) | |
| MID-ATLANTIC EMERGENCY | ) | |
| MEDICAL ASSOCIATES, PLLC | ) | HON. GRAHAM C. MULLEN |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| COMMUNITY HEALTH SYSTEMS, INC.; | ) | |
| HEALTH MANAGEMENT | ) | |
| ASSOCIATES, LLC, f/k/a HEALTH | ) | |
| MANAGEMENT ASSOCIATES, INC.; | ) | |
| MOORESVILLE HOSPITAL | ) | |
| MANAGEMENT ASSOCIATES, LLC, | ) | |
| d/b/a LAKE NORMAN REGIONAL | ) | |
| MEDICAL CENTER; STATESVILLE | ) | |
| HMA, LLC, d/b/a DAVIS REGIONAL | ) | |
| MEDICAL CENTER; ENVISION | ) | |
| HEALTHCARE CORPORATION, f/k/a | ) | |
| EMERGENCY MEDICAL SERVICES | ) | |
| CORPORATION; EMCARE, INC.; | ) | |
| EMCARE HOLDINGS, INC.; and | ) | |
| EMERGENCY MEDICAL SERVICES, | ) | |
| L.P. | ) | |
| | ) | |
| Defendants | ) | |

**SEVERED THIRD AMENDED COMPLAINT**

**(JURY TRIAL DEMANDED)**

# Table of Contents

PARTIES ........................................................................................................................... 1

INTRODUCTION ............................................................................................................ 6

JURISDICTION AND VENUE ....................................................................................... 7

PROCEDURAL HISTORY .............................................................................................. 8

FACTS ............................................................................................................................ 13

*Medicare, Medicaid, and Other Healthcare Payors* .................................................... 13

*The Federal False Claims Act and Federal Anti-Kickback Statute* ............................ 15

*Plaintiffs' Relationship with HMA, Lake Norman Hospital, Davis Hospital, and EmCare* ........................................................................................................................ 16

*HMA's Organizational Structure* ............................................................................... 16

*MEMA Contracts to Staff the Lake Norman Hospital and Davis Hospital ERs* ......... 18

*EmCare Contracts to Staff Other HMA ERs* .............................................................. 20

*HMA's ER Processes and Protocols* ........................................................................... 22

*HMA Uses Pro-MED Software to Artificially Inflate Diagnostic Testing and Admissions to Increase Revenues* ................................................................................. 22

*HMA Uses Pro-MED Software to Circumvent Individual Physicians' Judgment As to Medical Necessity* ........................................................................................................ 26

*HMA Uses Fraudulent Benchmarks to Increase Revenue through Medically Unnecessary Diagnostic Testing and Admissions* ...................................................... 28

*HMA's Budget-Driven Benchmarks Put Profits over Safety* ...................................... 30

*HMA Executives Closely Monitor Hospital Admissions* ............................................. 32

*Plaintiffs Complain of Fraud When HMA Releases Revised CTM Guidelines* ........... 34

*Plaintiffs Attempt to Work with HMA to Reduce the CTM Guidelines To Non-Fraudulent Levels and Avoid Unnecessary Admissions* ............................................. 39

*HMA Revises its CTM Guidelines to Increase the Already-Inflated Number of Diagnostic Tests* .......................................................................................................... 40

*Fraudulent Tests and Admissions by HMA, Lake Norman Hospital, and Davis Hospital Continue Despite Plaintiffs' Efforts to Stop the Fraud* .................................. 41

*HMA Initiates Chart Reviews as a Pretext to Terminate MEMA* ............................... 41

*MEMA Physicians Continue to Provide Outstanding Patient Care* ........................... 43

*HMA Offers Kickbacks to Induce MEMA Physicians to Generate Medically Unnecessary Diagnostic Tests and Admissions* ........................................................... 45

*HMA, Lake Norman Hospital, and Davis Hospital Ignore Plaintiffs' Complaints of Fraud* ............................................................................................................................. 46

*EmCare Interferes with the Lake Norman Hospital Agreement and the Davis Hospital Agreement* .......................................................................................................................... 47

*HMA Maliciously Terminates the Lake Norman Hospital Agreement and the Davis Hospital Agreement* ............................................................................................................. 49

*HMA Defames and Slanders the ER Physicians at MEMA, Including Dr. Mason and Dr. Folstad* ................................................................................................................................. 52

FIRST CLAIM FOR RELIEF (Retaliation in Violation of the Federal FCA Against the HMA Defendants) ................................................................................................................. 53

SECOND CLAIM FOR RELIEF (Retaliation in Violation of the North Carolina FCA Against the HMA Defendants) ....................................................................................... 55

THIRD CLAIM FOR RELIEF (Tortious Interference with a Contractual Relationship Against the EmCare Defendants) ...................................................................................... 57

FOURTH CLAIM FOR RELIEF (Tortious Interference with a Contractual Relationship Against CHS and HMA) ...................................................................................................... 58

FIFTH CLAIM FOR RELIEF (Defamation and Slander Per Se Against the HMA Defendants) ...................................................................................................................... 59

SIXTH CLAIM FOR RELIEF (Violation of the North Carolina Unfair and Deceptive Trade Practices Act Against the HMA Defendants and the EmCare Defendants) .................. 60

SEVENTH CLAIM FOR RELIEF (Civil Conspiracy Against the HMA Defendants and the EmCare Defendants) ...................................................................................................... 62

DEMAND FOR A JURY TRIAL ......................................................................................... 63

PRAYER FOR RELIEF ........................................................................................................ 63

**NOW COME**, Plaintiffs, by and through their attorneys of record, and hereby amend and restate their Severed Second Amended Complaint as follows:

**PARTIES**

1. Plaintiff Mid-Atlantic Emergency Medical Associates, PLLC ("MEMA") is a professional medical corporation organized and existing under the laws of the State of North Carolina. Founded in 1976 as Mecklenburg Emergency Medical Associates, MEMA provides emergency room ("ER") medical services under professional services agreements with hospitals in and around the Charlotte, North Carolina area. MEMA has done so for over forty years. MEMA's principal place of business is located at 501 S. Sharon Amity Road, Suite 300, Charlotte, North Carolina.

2. MEMA physicians provided ER coverage under professional services agreements with two hospitals then-owned and operated by Defendant Health Management Associates, LLC, f/k/a Health Management Associates, Inc. ("HMA"): Davis Regional Medical Center ("Davis Hospital") beginning on November 1, 2000 and Lake Norman Regional Medical Center ("Lake Norman Hospital") beginning on July 1, 1996. MEMA's contracts at these two HMA hospitals were summarily and unlawfully terminated on May 3, 2010 effective on August 31, 2010 and November 3, 2010, respectively.

3. Plaintiff Thomas L. Mason, MD, FACEP ("Dr. Mason") is a citizen and resident of North Carolina. Dr. Mason is board-certified in emergency medicine and licensed to practice medicine under the laws of North Carolina. Dr. Mason has been in private medical practice since 1994. Dr. Mason served as the Emergency Medical Department Medical Director (the "ER Medical Director") at Lake Norman Hospital from 1997 until November 3, 2010, when MEMA's contract was terminated. Dr. Mason also served as a member of Lake Norman Hospital's Medical Executive Committee (the "MEC") for 13 years. Dr. Mason served as Lake Norman Hospital's

1

Chief of Staff and was selected by HMA to serve as the Division I representative of the ED Core Committee. At all times relevant to this action, Dr. Mason was a principal shareholder of, and thus had an ownership interest in, Plaintiff MEMA. Dr. Mason's actions as alleged herein were done individually and on behalf of MEMA.

4. Plaintiff Steven G. Folstad, MD, FACEP ("Dr. Folstad") is a citizen and resident of North Carolina. Before completing his formal education, Dr. Folstad served in the United States Navy. Dr. Folstad is board-certified in emergency medicine and licensed to practice medicine under the laws of North Carolina. Dr. Folstad has been in private medical practice since 1997. In 2000, Dr. Folstad began working at Davis Hospital as its ER Medical Director. Dr. Folstad held that position until January 2008, when he became the President and Chief Executive Officer ("CEO") of MEMA.

5. As MEMA CEO, Dr. Folstad was thereafter responsible for the internal operations of MEMA and served as a point of contact between MEMA and the hospitals it contracted with to provide ER services. Dr. Folstad served as President and CEO of MEMA, and as one of its Directors, until 2014. At all times relevant to this action, Dr. Folstad was a principal shareholder of, and thus had an ownership interest in, MEMA. Dr. Folstad's actions as alleged herein were done individually and on behalf of MEMA.

6. Defendant HMA, at all times relevant to this action, was a Delaware for-profit corporation whose principal place of business was located at 5811 Pelican Bay Boulevard, Naples, Florida 34108.

7. Defendant Community Health Systems, Inc. ("CHS") is a Delaware for-profit corporation whose principal place of business is located at 4000 Meridian Boulevard, Franklin, TN 37067. CHS transacts business throughout the United States, including within the Western

2

District of North Carolina. Following CHS's acquisition of HMA in January 2014 for $3.6 billion in cash and stock, HMA became a wholly-owned indirect subsidiary of CHS and CHS became the parent company of, and successor-in-interest to, HMA.[1] CHS was aware of the allegations of this lawsuit against HMA when it acquired HMA. Further, Plaintiffs are informed and believe that:

    a.    CHS and HMA engage in the same business of providing for-profit hospital services;

    b.    CHS's acquisition of HMA, a publicly-traded company, resulted in a *de facto* merger of the two corporations making CHS the second largest for-profit hospital system in the United States;

    c.    CHS expressly agreed to assume liability for HMA as evidenced by CHS's payment of $262 million dollars in 2018 as part of a settlement agreement (the "Settlement Agreement") with the United States Department of Justice to resolve federal False Claims Act (the "FCA") and federal Anti-Kickback Statute (the "AKS") violations by HMA;[2]

    d.    In August 2014, CHS paid $98.15 million to the United States to resolve FCA cases involving its own unnecessary ER admissions.[3] The conduct covered in this settlement agreement between the United States and CHS included the submission of claims for medically unnecessary in-patient admissions, which should have been billed as outpatient or observations services;

---

[1] *See*: https://www.sec.gov/Archives/edgar/data/1108109/000119312518282710/d631278dex991.htm
[2] *See*:https://www.justice.gov/opa/pr/hospital-chain-will-pay-over-260-million-resolve-false-billing-and-kickback-allegations-one
[3] *See*:https://www.justice.gov/opa/pr/community-health-systems-inc-pay-9815-million-resolve-false-claims-act-allegations

e.	CHS continues to operate many hospitals formerly owned by HMA at the same locations and with substantially the same management and staff; and

f.	CHS has assumed the ordinary business obligations of HMA.

8.	Defendant Lake Norman Hospital, is a North Carolina Limited Liability Company located at 171 Fairview Road, Mooresville, North Carolina 28117. At all times relevant to this action, Lake Norman Hospital's principal mailing address was 5811 Pelican Bay Boulevard, Suite 500, Naples, Florida 34108. Lake Norman Hospital was acquired by HMA in 1986 as a wholly-owned subsidiary of HMA.

9.	Defendant Davis Hospital, is a North Carolina Limited Liability Company located at 218 Old Mocksville Road, Statesville, North Carolina 28625. At all times relevant to this action, Davis Hospital's principal mailing address was 5811 Pelican Bay Boulevard, Suite 500, Naples, Florida 34108. Davis Hospital was acquired by HMA in 2000 as a wholly-owned subsidiary of HMA.

10.	CHS, HMA, Lake Norman Hospital, and Davis Hospital are collectively referred to herein as the "HMA Defendants."

11.	Defendant Envision Healthcare Corporation ("Envision") was formerly known as Emergency Medical Services Corporation ("EMSC") before announcing, on or about June 11, 2013, that it changed its name to Envision. Envision is presently a wholly owned indirect subsidiary of Enterprise Parent Holdings Inc. As reflected in the Agreement and Plan of Merger by and among Enterprise Parent Holdings Inc., Enterprise Merger Sub Inc., and Envision, dated as of June 10, 2018,[4] Envision continues its corporate existence under Delaware law as the Surviving Corporation, as defined by the Agreement and Plan of Merger, and as an indirect wholly

_____

[4] *See*: https://www.sec.gov/Archives/edgar/data/1678531/000095012318008376/d608534ddefm14a.htm.

owned subsidiary of Enterprise Parent Holdings Inc. Prior to the merger, and at all times relevant to this action, Envision was a Delaware for-profit corporation whose principal place of business was located at 6200 S. Syracuse Way, Suite 200, Greenwood Village, Colorado 80111. Envision is a provider of emergency medical services and facility-based outsourced physician services throughout the United States, including within the Western District of North Carolina.

12.     Defendant EmCare, Inc. ("EmCare"), is a corporation organized and existing under the laws of the state of Delaware.  At all times relevant to this action, its principal address was 6200 S. Syracuse Way, Suite 200, Greenwood Village, Colorado 80111.  EmCare transacts business throughout the United States, including within the Western District of North Carolina. Plaintiffs are informed and believe that EmCare is a wholly owned indirect subsidiary of Envision.

13.     Defendant EmCare Holdings, Inc. ("EmCare Holdings") is a corporation organized and existing under the laws of the State of Delaware.  At all times relevant to this action, its business address was 1717 Main Street, Suite 5200, Dallas, Texas 75201.  EmCare Holdings transacts business throughout the United States, including within the Western District of North Carolina.  Plaintiffs are informed and believe that EmCare Holdings is a wholly owned subsidiary of Envision.

14.      Defendant Emergency Medical Services, L.P. ("EMS") is a limited partnership organized and existing under the laws of the State of Delaware.  At all times relevant to this action, its business address was 6200 S. Syracuse Way, Suite 200, Greenwood Village, Colorado 80111. Plaintiffs are informed and believe that EMS is a wholly owned indirect subsidiary of Envision.

15.     Envision, EmCare, EmCare Holdings, and EMS are collectively referred to herein as the "EmCare Defendants."

## INTRODUCTION

16. This action arises out of a nationwide scheme by the HMA Defendants and the EmCare Defendants to generate illegal revenues by submitting false claims to Medicare, Medicaid, other federally-funded healthcare programs, private healthcare insurers, and patients who were self-payors through medically unnecessary diagnostic tests and hospital admissions involving ER patients. HMA's fraud included a national kickback scheme where emergency contracts were awarded as lucrative inducements for EmCare's participation in HMA's ER fraud.

17. HMA knew that admitting patients without medical necessity would unnecessarily expose those patients to all of the risks inherent to hospital admission – including hospital-acquired illnesses. In a Medicare-aged population, the risk of hospital acquired infections is even greater in light of compromised immune systems that often affect the elderly. Ordering unnecessary diagnostic tests exposed young children to more needle sticks and other invasive examinations so that HMA could meet its artificial revenue benchmarks through blood tests and other diagnostic testing.

18. Dr. Mason and Dr. Folstad, along with other members of MEMA, complained about and engaged in efforts to stop these illegal and fraudulent schemes. They rejected HMA's pressure on them to participate in such fraudulent schemes. Because of Plaintiffs' complaints and efforts to thwart the fraudulent practices of the EmCare Defendants and the HMA Defendants, HMA retaliated against Plaintiffs in the terms and conditions of their work, ultimately terminating MEMA's emergency services contracts with both Lake Norman Hospital and Davis Hospital.

19. Plaintiffs originally brought this action as *qui tam* Relators on their own behalf and on behalf of the United States of America and the States of North Carolina, Florida, Georgia, Oklahoma, Tennessee and Texas against the HMA Defendants and the EmCare Defendants for

violations of the federal FCA and state analogs related to the submission of false claims to government healthcare programs, including Medicare and state Medicaid programs.

20.     In December 2017, EmCare paid $33 million to the United States and named states to resolve the Government's federal and state FCA claims raised by Plaintiffs' allegations. Thereafter, on September 25, 2018, the United States Department of Justice and the United States Attorney's Office for the Western District of North Carolina announced that the Government had reached a $262 million settlement with HMA and CHS to resolve HMA's federal criminal, civil and administrative liability to the United States, the Department of Health and Human Services Office of Inspector General, the Department of Defense, and certain participating states. CHS paid $74.5 million of this settlement to resolve the federal FCA allegations that HMA had engaged in a corporate-wide scheme related to ER fraud and $8.96 million of the settlement to resolve allegations that HMA had violated the AKS through its relationship with EmCare.

21.     This Severed Third Amended Complaint contains the remaining federal and state retaliation claims and supplemental state law claims arising out of the Defendants' unlawful conduct against the Plaintiffs.

## JURISDICTION AND VENUE

22.     This action arises under the laws of the United States of America and North Carolina to redress violations of the federal FCA, 31 U.S.C. § 3729 *et seq*., particularly 31 U.S.C. § 3730(h), and violations of North Carolina common and statutory law, including the North Carolina FCA and N.C. Gen. Stat. § 1-605 *et seq.*

23.     The Court has subject matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

7

24.     The Court has jurisdiction over Plaintiffs' claims under the North Carolina FCA pursuant to 31 U.S.C. § 3732(b) because Defendants' violations of that act arise from the same transactions or occurrences as their action under 31 U.S.C. § 3730.

25.     The Court has supplemental jurisdiction over Plaintiffs' other state law claims pursuant to 28 U.S.C. § 1367(a) because Defendants' state law violations and claims are part of the same case or controversy as Defendants' violations of the federal FCA.

26.     The Court has personal jurisdiction over all Defendants because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because all the Defendants have at least minimum contacts with the United States, and can be found in, transact business in, or have transacted business in the Western District of North Carolina.

27.     The HMA Defendants and the EmCare Defendants regularly perform healthcare services and submit or cause the submission of thousands of claims for payment to federal and state healthcare programs, including, but not limited to, Medicare and Medicaid, in addition to private healthcare insurers and patients who are self-payors. Accordingly, the Defendants are subject to the jurisdiction of this Court.

28.     Venue lies under 28 U.S.C. § 1391(b),(c) and 31 U.S.C. § 3732(a) because the Western District of North Carolina is a district in which any one Defendant can be found or transacts business, and an act proscribed by 31 U.S.C. § 3730 occurred within this district.

**PROCEDURAL HISTORY**

29.     On September 23, 2010, Plaintiffs, as Relators, filed a sealed *qui tam* complaint alleging the HMA Defendants and EmCare Defendants submitted or caused the submission of false claims to federal and state health programs, in violation of the federal FCA and analogous state false claims acts. Plaintiffs filed First and Second Amended Complaints, on April 18, 2011

and April 12, 2012 respectively, adding factual allegations and asserting additional causes of action against the HMA Defendants and EmCare Defendants.

30.    Plaintiffs' federal FCA complaint alleged a nationwide scheme by the HMA Defendants and the EmCare Defendants to defraud federal and state healthcare programs by submitting false claims related to patients treated in HMA's hospital emergency rooms.  Generally, Plaintiffs alleged the HMA Defendants subjected patients to medically unnecessary diagnostic testing, fraudulent outpatient billings, and sought to admit ER patients to its hospitals without regard for medical necessity.

31.    Plaintiffs also alleged the HMA Defendants acted in concert with the EmCare Defendants to defraud government healthcare programs and the HMA Defendants retaliated against Plaintiffs for complaining about, attempting to stop, and refusing to participate in ER fraud. Plaintiffs further alleged that the HMA Defendants and the EmCare Defendants violated the AKS statute pursuant to a scheme in which EmCare would refer patients for medically unnecessary tests and admission to HMA hospitals. In return, HMA rewarded EmCare with ER services and hospitalist contracts at HMA hospitals.  Pursuant to this Court's Order and 31 U.S.C. § 3730(b), the complaint remained under seal while the United States and the named states investigated Plaintiffs' fraud allegations.

32.    In the fall of 2012, the United States Department of Justice advised Plaintiffs that the United States intended to intervene in their case and file a Motion with the Judicial Panel on Multidistrict Litigation (the "MDL Panel") requesting a transfer of the federal FCA allegations in this case against the HMA Defendants and the EmCare Defendants. The United States also notified Plaintiffs' counsel that it intended to request that the MDL Panel transfer six other cases against the HMA Defendants and one other case against the EmCare Defendants pending in other district

9

courts. Plaintiffs consented to the motion, but noted: (a) their objection to the inclusion of their private claims, including: (i) claims under 31 U.S.C § 3730(h); (ii) claims under N.C. Gen. Stat. § 1-605 *et seq.*; (iii) claims under N.C. Gen. Stat. § 75-1.1 *et seq.*; and (iv) other claims under North Carolina statutory and common law (together the "Private Claims") against the HMA Defendants and the EmCare Defendants; and (b) their intention to request, when appropriate, the transfer of those claims back to the Western District of North Carolina for resolution of substantive motions and trial.

33. On April 3, 2014, the MDL Panel ordered the centralization of Plaintiffs' action and seven other federal FCA cases in the District of Columbia for the coordination and consolidation of pre-trial proceedings relating to the federal FCA claims. Case MDL No. 2524, Dkt. No. 30.

34. On June 2, 2014, the U.S. District Court for the District of Columbia stayed the proceedings and administratively closed Plaintiffs' action so the United States could negotiate a global settlement of the federal and state FCA claims with the HMA Defendants and EmCare Defendants. Case No. 1:14-cv-579, June 2, 2014 Minute Order.

35. On January 18, 2018, after EmCare paid $33 million to the United States and named plaintiff states to resolve the Government's federal FCA claims raised by Plaintiffs' allegations, the United States filed a notice of dismissal based on the settlement agreement pertaining to Plaintiffs' federal FCA claims against the EmCare Defendants. On January 22, 2018, the Court ordered dismissal of those resolved FCA claims. Case No. 1:14-mc-339, Dkt. Nos. 66, 71, 74.

36. On September 25, 2018, the United States Department of Justice and the United States Attorney's Office for the Western District of North Carolina announced the Settlement

Agreement with CHS, parent company of the other HMA Defendants, pursuant to which CHS would pay $262 million to resolve false hospital billing and kickback allegations.[5]

37.     The Settlement Agreement resolved the HMA Defendants' federal criminal, civil and administrative liability to the United States, the Department of Health and Human Services Office of Inspector General, and the Department of Defense.   The terms contained in the Settlement Agreement included: (i) civil payments by HMA, CHS, and its affiliates, of more than $74 million plus interest to the federal government and participating Medicaid states to settle eight whistleblower lawsuits (including Plaintiffs') filed under federal and state FCAs related to the HMA Defendants' ER fraud; and (ii) conduct that resulted in false claims the HMA Defendants submitted for medically unnecessary admissions and out-patient ER care.   On October 31, 2018, the MDL court entered an order approving the joint stipulation of dismissal of the federal FCA claims consistent with the Settlement Agreement among the United States, the Plaintiffs, CHS, and HMA. Case No. 1:14-mc-339, Dkt. No. 116.

38.     As part of the criminal resolution of these FCA cases, HMA (now owned by CHS) entered into a three-year Non-Prosecution Agreement (the "NPA") with the Department of Justice Criminal Division Fraud Section.[6]   As part of the NPA, HMA "admit[ted], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the attached Statement of Facts, and that the facts described therein are true and accurate." *See* NPA at 3.

39.     HMA admitted that "HMA executives instituted a formal and aggressive plan to improperly increase overall [ER] inpatient admission rates at all HMA Hospitals.  As part of the

---

[5]   The Settlement Agreement is incorporated herein by this reference and can be found at https://www.falseclaimsact.com/wp-content/uploads/2017/12/MEMA-Settlement-Agreement.pdf.
[6]   The NPA is incorporated herein by this reference and can be found at: https://www.justice.gov/opa/press-release/file/1096406/download

plan, HMA executives set mandatory company-wide admission rate benchmarks for patients presenting to HMA Hospital [ERs]…solely to increase HMA revenue." Statement of Facts ¶ 28, Attachment A to NPA. HMA executives pressured and coerced contracted ER practice groups, medical directors, and physicians to meet the company's mandatory admission rate benchmarks. Statement of Facts ¶ 30, Attachment A to NPA.

40.     Pursuant to the NPA, HMA likewise admitted that it had engaged in a conspiracy with Company A (EmCare) to commit healthcare fraud, whose purpose was "for certain executives at HMA, certain administrators at the HMA Hospitals, certain executives and administrators of [EmCare], and others to unlawfully enrich and benefit . . . themselves, by unlawfully pressuring and inducing physicians serving HMA Hospitals . . . to increase the number of [ER] patient admissions without regard to whether the admissions were medically necessary, all so that the HMA Hospitals could bill and obtain reimbursement for higher-paying inpatient hospital care, as opposed to observation or outpatient care, from Federal healthcare programs, and increase HMA's revenue." Statement of Facts ¶ 27, Attachment A to NPA; *see also id.* ¶¶ 30(c), (e).

41.     Also, as part of the criminal resolution, on November 1, 2018, a subsidiary of HMA pled guilty, before the MDL judge in Washington, D.C., to conspiracy with Company A (EmCare) to commit health-care fraud under 18 U.S.C. § 1347.[7]

42.     On June 25, 2018, Plaintiffs filed a request for a suggestion of remand of their Private Claims against HMA and EmCare. Case No. 1:14-mc-339, Dkt. No. 82. In their request, the Plaintiffs noted that the purpose of the MDL would soon be fulfilled and that both the convenience of the parties and the just and efficient resolution of the Private Claims weighed in

---

[7] *See*: https://www.justice.gov/opa/press-release/file/1096676/download

favor of remand. Case No. 1:14-mc-339, Dkt. No. 82, page 5. HMA opposed Plaintiffs' request. Case No. 1:14-mc-339, Dkt. No. 83.

43.     On December 10, 2018, Plaintiffs made a second request to the MDL Court, and for expedited relief, again seeking a prompt remand of the Plaintiffs' Private Claims to this Court. In their request, the Plaintiffs highlighted that the purpose of the MDL (resolution of the Government's claims under the FCA against HMA) had been fulfilled, that eight years had passed since the filing of their lawsuit, and while the Plaintiffs' Private Claims were stayed in the MDL, two witnesses had passed away.

44.     On December 21, 2018, HMA again opposed the remand of Plaintiffs' Private Claims. Case No. 1:14-mc-339, Dkt. No. 135. At the hearing before the MDL judge on January 16, 2019, HMA offered no reason why Plaintiffs' Private Claims should not be remanded to this Court.

45.     On January 28, 2019, the MDL Court entered an Order and Suggestion of Remand that the Plaintiffs' Private Claims be remanded to the Western District of North Carolina. Case No. 1:14-mc-339, Dkt. No. 141.

**FACTS**

*Medicare, Medicaid, and Other Healthcare Payors*

46.     The Medicare Program is a federal healthcare program providing benefits to persons who are age 65 and older or disabled.  Medicare now has four parts: Part A (hospital insurance), Part B (medical insurance), Part C (managed care plans), and Part D (prescription drug program).

47.     Medicare Part A helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities.  Medicare Part A also helps cover hospice care and some home healthcare.

48.     Medicare Part B helps cover doctors' professional services and outpatient care, including ER services.  Charges for ER services usually have two components: facility charges paid to the hospital and professional charges paid to the emergency physician.  Medicare Part B covers the hospital's charge for the ER itself, paying the full approved amount except for the patient co-payment.  The emergency physician who cares for a patient usually bills the patient separately for his professional services, and Medicare Part B pays 80% of the approved amount for those services.

49.     Medicare considers patients kept in the hospital for observation (usually for 23 hours or less) as receiving outpatient services.  Medicare Part B covers hospital care for observation patients at a lower rate than those paid for inpatient services under Medicare Part A.

50.     To participate in Medicare, providers must ensure their services are provided economically and only when medically necessary.  Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act establish that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services.  42 C.F.R. § 424.10.  Medical care is medically necessary when ordered or prescribed by a licensed physician or other authorized medical provider and the program agrees the care is necessary and proper.[8]

51.     The severity of a patient's condition is directly related to the ER charges submitted by hospitals for the facility charges to government-sponsored healthcare programs.  Patient acuity impacts both outpatient ER care and inpatient care for ER patients admitted to the hospital.  Various factors can increase a hospital's rate of reimbursement for the facility side of emergency care:  the severity of the patient's illness or chief complaint; the care rendered by the ER nurse;

---

[8]*See also* Statement of Facts ¶¶ 15-17, Attachment A to NPA.

the performance of diagnostic tests or procedures; the care rendered by the ER physician; and a consultant's examination of the patient.

52.     Medicaid is a federal healthcare program providing benefits for low-income patients.  Funding for Medicaid is shared between the federal government and state governments that participate in the funding of the program.  While Medicaid reimbursement for ER care varies by state, states generally reimburse the hospital for the inpatient or outpatient services provided and separately reimburse laboratory services and radiology services performed in the ER.

53.     Like Medicare, Medicaid only covers services or supplies that are medically necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area.

Medicare and Medicaid are not the only victims of healthcare fraud.  Private healthcare insurers and patients who are self-payors also suffer when they are forced to pay for diagnostic testing and admissions which are medically unnecessary.

### *The Federal False Claims Act and Federal Anti-Kickback Statute*

54.     The federal FCA generally imposes civil liability on those who knowingly present false or fraudulent claims to the federal government for payment or approval, knowingly make a record or statement material to such a claim or who otherwise conspire to present such claims.  31 U.S.C. § 3729(a)(1)(A), (B) and (C).

55.     The federal AKS, 42 U.S.C. § 13207b(b), generally criminalizes the offer, payment, solicitation, or receipt of remuneration for ordering, arranging for, or recommending ordering any service or items for which payment may be made, in whole or in part, by a federal healthcare program.  42 U.S.C. § 1320a-7b(b).  Following the 2010 amendments to the AKS, any claim for

federal healthcare program reimbursements resulting from an AKS violation is false or fraudulent for purposes of the FCA.  42 U.S.C. § 1320a-7b(g).

### *Plaintiffs' Relationship with HMA, Lake Norman Hospital, Davis Hospital, and EmCare*

#### *HMA's Organizational Structure*

56.     In September 2008, Gary Newsome ("Newsome"), who had his MBA, became President and CEO of HMA.  Newsome had previously been a senior executive at HMA from 1993 to 1998, when he left to become a divisional President of Hospital Operations at CHS. He held that position at CHS for more than a decade, from 1998 until 2008, when he rejoined HMA to lead the company. In August 2014, CHS agreed to pay $98.15 million to the federal government to resolve FCA violations related to ER care provided between 2005 and 2010, during the same period that Newsome served as Divisional President of Hospital Operations for CHS.[9] The conduct covered in the CHS settlement agreement resolving the medically unnecessary ER admissions fraud by CHS was nearly identical to the language in the more recent HMA Settlement Agreement which included the time period when Newsome was CEO of HMA.

57.     Upon becoming HMA's CEO in 2008, Newsome reorganized corporate leadership so that all HMA hospital operations reported directly to him.  Newsome also reorganized HMA's operations into five Divisions, each with its own Division CEO and Chief Financial Officer ("CFO").  The Division CFOs reported directly to the Division CEOs, who, in turn, reported directly to Newsome.   After Newsome's reorganization, Lake Norman Hospital and Davis Hospital were included in HMA's Division I. At the time, these were the only hospitals within HMA's Division I where EmCare did not already have the ER contracts.

---

[9]    *See*:    https://www.businesswire.com/news/home/20080915005559/en/Gary-Newsome-Named-President-CEO-Health-Management.

58.     Newsome ultimately recruited several other former CHS executives, including Britt Reynolds ("Reynolds"), Division 1 CEO of HMA in December 2008, Angie Marchi ("Marchi'), Division 1 VP of Operations for HMA in April 2009, and Greg Lowe ("Lowe"), Lake Norman Hospital CEO in June 2009, to help him implement the fraudulent practices used at CHS in HMA's ER. In fact, while still at CHS, Reynolds was providing Newsome, who had already arrived at HMA, with the ER management initiatives he had developed at CHS.

59.     These former CHS executives were familiar with CHS's ER management practices, systems, and Pro-MED software. They understood Newsome's focus on ER revenue and were willing to implement his tactics for driving hospital revenues through fraudulent ER practices. Newsome instructed his recruited CHS executives and the executives already in place at HMA to implement these fraudulent revenue-driving tactics in HMA hospitals nationwide. HMA executives were aware that Newsome would drive the fraudulent growth of ER revenue before he even took over HMA in September 2008.

60.     HMA's corporate executives during the relevant time also included Kelly Curry ("Curry"), Chief Operating Officer ("COO"), Ronald Riner ("Riner"), MD, an independent consultant serving as HMA's Chief Medical Officer ("CMO"), and Lynne West ("West"), RN, Corporate Director of Emergency Services. All of these executives were business people. Even Riner practiced medicine for only 15 years before "devoting himself to the business of healthcare."

61.     In addition to Divisional executives, each HMA facility was led by a local hospital executive team, which generally included a CEO, CFO, COO, CMO, and Chief Nursing Officer ("CNO"). Each HMA hospital ER included an ER Medical Director provided by the physician group rendering emergency care under contract with the hospital.

17

*MEMA Contracts to Staff the Lake Norman Hospital and Davis Hospital ERs*

62.     During the relevant period, HMA staffed its 55 ERs across the country with both independent contractor emergency physicians and HMA employees.  Because HMA hospitals did not employ physicians or physician assistants to provide ER services, HMA retained independent contractor emergency physicians and physician assistants through professional services agreements with contracting companies (such as EmCare) or local independent emergency physician practice groups (such as MEMA).   The remaining ER staff, including nurses, administrative support staff, and ministerial support, were HMA employees.

63.     MEMA entered into professional services agreements with Lake Norman Hospital and Davis Hospital to exclusively provide emergency physician coverage in the ERs of those hospitals.

64.     Under the Statement of Agreement between Lake Norman Hospital and MEMA (the "Lake Norman Hospital Agreement"), effective as of July 1, 1996, MEMA, as an independent contractor, would staff that hospital ER with independent contractor emergency physicians for a three-year period. The Lake Norman Hospital Agreement automatically renewed for three-year periods thereafter, with either party having the right to terminate the agreement upon six (6) months prior written notice.  The Lake Norman Hospital Agreement automatically renewed four separate times, between 1996 and 2010, prior to the HMA Defendants' unlawful termination of that Agreement.

65.     The Statement of Agreement between Davis Hospital and MEMA (the "Davis Hospital Agreement"), effective November 1, 2000, also provided that MEMA, as an independent contractor, would staff that facility's ER with independent contractor emergency physicians for a three-year period. The Davis Hospital Agreement also automatically renewed for three-year

18

periods thereafter, with either party having the right to terminate the agreement upon 120 days prior written notice. The Davis Hospital Agreement automatically renewed three separate times, between 2000 and 2010, prior to the HMA Defendants' unlawful termination of that Agreement.

66.     Both the Lake Norman Hospital Agreement and the Davis Hospital Agreement stated that Plaintiffs would provide adequate coverage for the hospital ERs, as determined in significant part by the hospitals and their executive directors, during the operational hours established by the hospitals. Lake Norman Hospital and Davis Hospital would provide all space, equipment, and supplies necessary for Plaintiffs' practice of emergency medicine, including a suitable reference library and access to informational databases. Under the Lake Norman Hospital Agreement and the Davis Hospital Agreement, the hospitals also employed and provided all non-physician personnel necessary to operate the ER, including technicians, clerks, and nurses.

67.     Both the Lake Norman Hospital Agreement and Davis Hospital Agreement set forth the scope of the contractor services Plaintiffs would provide.  The scope could be modified by MEMA only upon consultation with the officers and committees of the medical staff of the hospital.  Both the Lake Norman Hospital Agreement and the Davis Hospital Agreement further established criteria for the professional qualifications and professional activities of the physicians who would provide services at those facilities, including, but not limited to, the requirement that the physicians be in good standing with the hospitals' medical staffs in accordance with the bylaws of the hospitals.

68.     The Agreements required that Plaintiffs professionally, ethically and diligently carry out their responsibilities under both Agreements in a way that served the best interests of the patients, Lake Norman Hospital, and Davis Hospital.  The Lake Norman Hospital Agreement and the Davis Hospital Agreement contained "Nature of Relationship" provisions expressly providing

that MEMA and its physicians were independent contractors of Lake Norman Hospital and Davis Hospital.

69.    Both the Lake Norman Hospital Agreement and Davis Hospital Agreement provided that MEMA, with the approval of the hospitals' Executive Directors, would appoint the ER Medical Director for each hospital who was board certified in emergency medicine, internal medicine, or family practice. Per the terms of both agreements, the ER Medical Director would serve as the official communication link between MEMA and its physicians and their respective hospitals and would also: (i) ensure all necessary physician administrative services were provided for the efficient operation of the ERs; (ii) cooperate with and assist other members of the medical staff in performance improvement activities; (iii) serve on committees as constituted by the hospitals' bylaws; and (iv) assist with training hospital personnel.  The Agreements set forth additional duties of the ER Medical Director, including but not limited to recommending policies and procedures for their respective ERs, handling patient complaints and physicians' staff conflicts, and initiating other activities to improve ER services.

70.    From 1997 until November 1, 2010, Dr. Mason served as the ER Medical Director at Lake Norman Hospital.  Dr. Folstad served as the ER Medical Director at Davis Hospital from 2000 until January 2008, when he became President of MEMA.  At that time, another MEMA physician, Stephen Greer, MD, became the Davis Hospital ER Medical Director.  Dr. Greer held that position until the HMA Defendants unlawfully terminated that Agreement in 2010.

*EmCare Contracts to Staff Other HMA ERs*

71.    Beginning in approximately 1996, EmCare provided emergency physicians to staff HMA ERs.  In early January 2008, HMA and EmCare entered into a formal national arrangement

for EmCare to provide outsourced ER services under a national Preferred Provider Partnership Agreement (the "PPPA").[10]

72.    Pursuant to the PPPA, EmCare received preferential treatment from HMA relative to other medical staffing companies, including: non-public information regarding upcoming ER or hospitalist contract opportunities; the contact information for hospital executives with the authority to make contracting decisions between HMA's hospital subsidiaries and the ER or hospitalist providers; advance notice of hospital-based contracts coming available for bid; and the right to make the first bid for any hospital-based contract that became available.  HMA likewise "agreed to facilitate the opportunity to contract with the various HMA Facilities who are interested in the services available from the EMSC Companies and . . . further agreed to encourage the HMA Companies to contract with one or more of the EMSC Companies."

73.    HMA hospitals with EmCare-staffed ERs were among the most compliant in meeting HMA's fraudulent benchmarks for ordering diagnostic tests and for hospital admissions. EmCare assured HMA that its ERs were well-suited to increase hospital admissions and that it would meet HMA corporate ER benchmarks without regard to the medical necessity of the test or admission.

74.    EmCare's PPPA and ensuing conspiracy with HMA have been highly profitable endeavors for EmCare.  Before the PPPA, EmCare had obtained 21 ER contracts with HMA hospitals in the 14 years since EmCare began contracting with HMA in or around 1996. The PPPA marked an explosive period of growth for EmCare. In just two years (between January 1, 2008 and December 31, 2010), EmCare doubled the number of contracts with HMA hospitals from 21 to 40 ER and hospitalist contracts.

---

[10]A copy of the PPPA is incorporated herein by this reference and attached hereto as Exhibit A.

75. By late 2010, EmCare held exclusive contracts to staff the ERs of nearly 70% of HMA hospitals.[11] When Gary Newsome arrived at HMA in late 2008, all but two of HMA's Division 1 ERs were staffed with EmCare emergency physicians. At that time, the only non-EmCare hospitals in HMA's Division I – Lake Norman Hospital and Davis Hospital – had been staffed by MEMA and its physicians exclusively for more than a decade (since 1996 and 2000, respectively).

### HMA's ER Processes and Protocols

*HMA Uses Pro-MED Software to Artificially Inflate Diagnostic Testing and Admissions to Increase Revenues*

76. Pro-MED Clinical Systems, LLC ("Pro-MED") is a privately held Florida for-profit limited liability company. Pro-MED provided ER software and related consulting services to HMA hospitals. Plaintiffs are informed and believe that HMA used Pro-MED at all of its hospitals. Plaintiffs are further informed and believe that CHS, under Newsome's leadership, also used Pro-MED at its hospitals and was the only other Pro-MED customer of any significance.

77. Pro-MED provided HMA hospitals with "emergency room clinical pathway support services" through the following software or applications: (1) Patient Manager; (2) Complaint Test Mapping practice guidelines (the "CTM Guidelines"); and (3) case management software, including the "Quality Review" and "QualCheck" programs.

78. Pro-MED's Patient Manager program provided ER staff with automated status boards to monitor patient activity, from presentation to the ER through disposition. During this

---

[11]*See also* Statement of Facts ¶ 23, Attachment A to NPA ("Company A was one of the companies that HMA contracted with to provide [ER] services at HMA Hospitals. HMA was Company A's largest hospital customer."). Plaintiffs are informed and believe that EmCare is "Company A" identified in the NPA. Plaintiffs are further informed and believe that, by the end of 2010, EmCare staffed approximately 37 of HMA's 55 hospital ERs and provide hospitalists under contracts with five HMA hospitals (a total of 38 of the 55 HMA hospitals under contract with EmCare for ER or related hospitalist services).

process, Patient Manager used alerts to identify purportedly "high risk" patients to consider for admission. HMA installed monitors in the offices of its hospital CEOs displaying the status of each ER patient to enable the CEO to push admissions in real time. Newsome also had a monitor in his office that projected ER information from every HMA hospital across the country so that he could direct ED admissions.

79.     CTM Guidelines were diagnostic test sets automatically ordered by HMA's ER triage nurses, before the patient saw an ER physician, based on the patient's chief presenting complaint. Pro-MED developed the CTM Guidelines exclusively for HMA with EmCare's collaboration. The CTM Guidelines were in place at ERs throughout the HMA network, including at Lake Norman Hospital and Davis Hospital, since approximately late 2003.

80.     Before October 2008, local hospital CEOs permitted their ER Directors, including Dr. Mason and Dr. Folstad, to edit the CTM Guidelines to eliminate unnecessary tests and prevent them from being automatically generated at triage. Thus, until the arrival of Newsome as HMA's CEO, MEMA emergency physicians at Lake Norman Hospital and Davis Hospital could avoid ordering the unnecessary tests included in HMA's standard program and avoid admitting patients without medical necessity.

81.     The CTM Guidelines were not medical evidence-based standing orders developed to enhance patient care. They did not improve the efficiency or efficacy of patient care. The CTM Guidelines were designed to enable HMA hospitals to fraudulently increase reimbursement from federal and state programs like Medicare and Medicaid, as well as private healthcare insurers and patients who are self-payors.

82.     In July 2008, after meeting with HMA corporate management, Pro-MED prepared a "Time Studies and Patient Flow Assessment" under the guise of improving patient satisfaction.

However, in discussing the CTM Guidelines, Pro-MED revealed that "consistent utilization of the guidelines helps to optimize revenue potential for each patient visit," and alerted HMA that local edits to the CTM Guidelines at certain hospitals caused ER revenues to fall by over $300,000 <u>each month</u> per hospital.

83.     Because the CTM Guidelines did not improve efficiency or efficacy of patient care, Plaintiffs refused to adhere to HMA's CTM guidelines in practicing emergency medicine; rather, Plaintiffs focused on providing care that was medically-necessary and tailored to the unique needs of each patient.

84.     In keeping with Newsome's deliberate focus on ER revenue, in the fall of 2008, HMA reasserted corporate control over the CTM Guidelines tests and discontinued local flexibility in applying the guidelines.  HMA's insistence on adherence to the CTM Guidelines caused triage nurses and emergency physicians in HMA hospitals to regularly order thousands of excessive and medically unnecessary diagnostic tests that they billed to government programs and private insurers and individual self-payors.

85.     For example, since at least 2003, HMA utilized the Quality Review program to select ER patients for hospital admission based on very low threshold admission standards selected by HMA's financial officers and not medical professionals.  Quality Review selection was triggered solely by information in the patient's medical records, particularly the nurse's notes and tests ordered.  For instance, where the electronic medical records reflected a patient had blood in the urine (a common symptom of a bladder infection), Quality Review automatically selected that patient for admission to the hospital.  If an ER physician declined to recommend admission of a patient selected by the Quality Review software, HMA would demand justification for the decision.

24

86.     In October 2006, some HMA hospitals implemented the use of QualCheck, a software enhancement to the Pro-MED case management program. QualCheck would identify patients, prior to discharge from the ER, who met criteria for admission or further treatment. Similar to Quality Review, QualCheck searched a patient's electronic medical records for indications that the patient met HMA's pre-selected admission criteria and then prompted the ER physician to recommend the patient for admission. Importantly, the QualCheck program required the use of Pro-MED's physician's electronic medical record for the ER.

87.     HMA sought to implement the enhanced Pro-MED and the QualCheck program in order to increase hospital admissions by alerting the physician in "real time" (i.e., while a patient is still in the ER) that a patient should be admitted. The QualCheck program used exceedingly low admissions criteria selected by HMA non-physician financial officers, and it was run against the chart of every ER patient, from those with runny noses to gunshot wounds, slowing the process for physicians to complete their patient charts.  An ER physician who did not agree with the QualCheck admission alert (because admission was medically unnecessary) had to manually "override" the QualCheck program's recommendation for admission and document his or her medical justification for the override.

88.     Quality Review and QualCheck admission parameters for HMA hospitals were not based on medical necessity; rather, they were based on minimum, overly broad standards that might justify admission and payment under a federal or state healthcare program.  HMA utilized these programs to increase hospital admissions, for which it was reimbursed at a higher rate than ER services or outpatient ER care, by admitting patients who did not medically qualify for acute care admission through the ER.

89.     By late 2008, under Newsome's leadership, HMA required all its hospital ERs to use standard CTM Guidelines and adhere to Quality Review and QualCheck software prompts for recommending admission of ER patients, all to hold ER physicians accountable to HMA's demands for increased ER revenues and hospital admissions. These mandates improperly and illegally interfered with the ER physicians' independent medical judgment and decision-making as to the most appropriate and medically-necessary care for each patient.

*HMA Uses Pro-MED Software to Circumvent Individual Physicians' Judgment As to Medical Necessity*

90.     A patient arriving at an HMA ER was first assessed by a hospital-employed triage nurse, not an ER physician. At Lake Norman Hospital and Davis Hospital, the triage nurses were typically the least experienced nurses in the ER and were neither physician's assistants nor nurse practitioners.

91.     HMA measured ER nurses' performance on a variety of benchmarks, including the time from the patient's entry into the ER to completion of triage and the percentage of ER patients for whom the CTM Guidelines tests were implemented within 10 minutes of triage. Thus, the HMA triage nurse used information hastily gathered from the patient to determine the patient's chief presenting complaint. Without ER physician oversight, the patient's chief presenting complaint was selected from a drop-down menu in the Pro-MED system. The triage nurse's choice of the chief presenting complaint triggered the CTM Guidelines program, which automatically ordered a battery of diagnostic tests that purportedly corresponded to the chief presenting complaint.

92.     Because most patients present at ERs with multiple symptoms or complaints, it was medically inappropriate to entrust a triage nurse, who lacks the requisite experience and training, to determine a patient's chief presenting complaint. More importantly, HMA's practice of having

26

triage nurses determine the chief complaint and automatically order diagnostic testing without ER physician input violated the North Carolina Nursing Practices Act, N.C. Gen. Stat. § 90-171.19, *et seq*.

93.     The Pro-MED system was designed and implemented by HMA to frustrate the ER physician's cancellation of diagnostic tests ordered by the triage nurse.  Tests could not be cancelled or deleted within the Pro-MED system itself, but could only be deleted from the hospital's computer system.  To cancel a test at Lake Norman Hospital or Davis Hospital, an ER physician was required to create a paper record canceling the test and then physically deliver that record to the testing department. Manual cancellation of tests initiated by the triage nurses was time-consuming and often futile, as the tests were often completed before the ER physician first saw the patient.

94.     Once the diagnostic tests were completed and reviewed, the ER physician made a diagnosis, provided treatment, and arrived at a disposition for the patient.  The ER physician usually selected from one of three disposition options: (1) discharging the patient; (2) transferring the patient to another facility; or (3) calling the patient's private physician or a hospitalist physician to discuss whether the patient should be admitted or kept for observation.  The ER physicians could recommend admission for a particular patient, but a physician with admitting privileges (an HMA hospitalist, an attending member of the medical staff, or the patient's private physician) had to write the orders for observation or hospital admission which were necessary to move a patient from the ER to a hospital floor.

95.     Following the patient's disposition, the HMA hospital compiled the billing record and submitted a claim to Medicare, Medicaid, the private healthcare insurer or the self-payor patient for any facility charges associated with emergency care, in-patient care or observation.  By

submitting a claim, the hospital certified both the accuracy and medical necessity of the emergency services rendered, including the diagnostic tests ordered and admission decisions.

*HMA Uses Fraudulent Benchmarks to Increase Revenue through Medically Unnecessary Diagnostic Testing and Admissions*

96.     Before October 2003, HMA established thirteen corporate benchmarks for ER performance.  Two of these benchmarks – "Percentage of Guidelines Tests Ordered" and "Percentage of Patients with Tests Ordered" – focused on "optimizing revenue potential" by maximizing the number of diagnostic tests ordered for each ER patient.  Three other benchmarks – "Percentage of Admissions," "Percentage of Total Patients with Quality Review Identified Who Were Discharged," and "Percentage of Attendings Called" – focused on increasing the ER's rate of hospital admissions to meet HMA's corporate demands.

97.     HMA utilized these benchmarks for the illegal purpose of pressuring ER physicians and nursing staff at their hospitals to generate hundreds of millions of dollars in revenue for unnecessary hospital services.  These benchmarks were "solely to increase HMA revenue."[12]

98.     HMA's "Percentage of Guidelines Tests Ordered" benchmark applied to ER physicians.  It measured, as a percentage, the number of tests <u>not</u> cancelled by the ER physician divided by the total number of tests ordered by the triage nurse based on the CTM Guidelines.  Between 2003 and 2010, HMA's national corporate benchmark for ordering CTM Guidelines tests was greater or equal to 80%.  In 2010, without evidence-based medical reason or change in patient population, HMA raised this benchmark to 85%.  This benchmark pressured ER physicians not to cancel diagnostic tests ordered at triage even though they were not medically necessary.

99.     HMA's "Percentage of Patients with Tests Ordered" benchmark applied to HMA's nursing staff.  It measured the percentage of patients with at least one diagnostic test ordered using

---

[12]Statement of Facts ¶ 28, Attachment A to NPA.

the CTM Guidelines within 10 minutes of triage. To boost this benchmark, HMA required the triage nurse to order tests within ten minutes of triage so that the tests would be initiated (e.g., blood drawn) before the ER physician saw the patient and could cancel unnecessary tests.

100. Between 2003 and 2008, HMA's benchmark for the Percentage of Patients with Tests Ordered immediately after triage was 67%. In July 2008, without medical necessity or change in patient population, HMA increased this benchmark to 70%.

101. Plaintiffs are informed and believe that HMA's corporate benchmark for "Percentage of Patients with Quality Review Who Were Discharged" has been 35% or less since approximately 2003. To meet this benchmark, HMA required its ER physicians to recommend hospital admission for at least 65% of patients selected through the Quality Review program, without regard for the medical necessity of those admissions.

102. HMA also established a corporate benchmark – of less than 30% – for QualCheck overrides, meaning ER physicians must admit at least 70% of patients selected for admission by the low standards chosen by HMA to trigger a prompt in the QualCheck program. HMA's mandate was enforced without regard to the ER physicians' independent medical judgment regarding the medical necessity of the admission.

103. HMA's "Percentage of Admissions" benchmark measured the number of ER patients admitted to the hospital as a percentage of the total number of ER patients for the given period (day, week, month, and year). Beginning in October 2003, HMA's Percentage of Admissions benchmark was 16%. HMA imposed higher admissions benchmarks on some ERs including a 25% benchmark imposed on Lake Norman Hospital.

104. In 2010, Lake Norman Hospital admitted approximately 15% of their average daily ER volume of 70 patients. Meeting HMA's goal of 25% required the Lake Norman Hospital ER

to admit seven additional patients per day and would have generated roughly $35,000 of additional hospital revenue per day, or $12 million per year.

105.    HMA's establishment of minimum admission benchmarks for ER patients disregarded medical necessity standards and ran afoul of applicable federal and state laws and regulations.  In fact, "[a]t some HMA Hospitals, ER physicians whose admission override rates exceeded HMA's corporate benchmark were given 'failing' admission grades.  HMA illegally used these override rates to pressure ER physicians with 'failing' grades to admit patients who did not require inpatient admission."[13]

106.    Prior to 2010, HMA's "Percentage of Attendings Called" benchmark required ER physicians to call the attending physician (e.g., the patient's primary care provider) for more than 30% of ER patients. HMA executives admittedly set this benchmark understanding that calls to attending physicians significantly increased the likelihood a patient would be admitted to the hospital. By contrast, Plaintiffs are informed and believe that the national average for ER physician calls to attending physicians is 15-20%.  In April 2010, without medical necessity or change in patient population, HMA increased the benchmark for attendings called to greater than 35% of all ER patients.

*HMA's Budget-Driven Benchmarks Put Profits over Safety*

107.    HMA's admission and testing benchmarks were not derived from patient care, rather, they were set to meet the particular hospital's revenue budget. HMA's divisional and corporate executives set each hospital's budget based on year-over-year increases in admission, despite there being no changes in the demographics of the patients in the community which the hospital served.

---

[13]Statement of Facts ¶ 30(b), Attachment A to NPA.

108.     HMA utilized more aggressive corporate revenue budget-driven benchmarks for Medicare-age patients (those sixty-five and older):  a minimum admission rate of at least 50% (exceeding the national average Medicare admission rate of 45%); and a percentage of attendings called of at least 75% (far in excess of the typical 15-20% average).  During Plaintiffs' tenure at Lake Norman Hospital and Davis Hospital, HMA executives heavily scrutinized the admission rate and percentage of attendings called for all patients sixty-five and over.

109.     In further direct challenge to the ER physicians' independent medical judgment, HMA actually expected a much higher admission rate for Medicare-aged patients than the corporation's already bloated benchmarks.  For example, HMA told MEMA physicians at Davis Hospital that they should contact the attending physician to discuss hospital admission for 100% of patients over 65.   Dr. Greer, Davis Hospital's ED Director, refused, telling hospital administrators that he would not wake up an ER patient's attending physician in the middle of the night to discuss or recommend a medically unnecessary admission.

110.     As another means of generating artificially high admission rates, HMA pressured admitting physicians to admit ER patients for in-patient care rather than keep them for observation, because the hospital reimbursement rate was much lower for observations.[14]

111.     For example, beginning in early 2010, Davis Hospital executives required ER charge nurses to notify hospital administration whenever the ER physician recommended observation rather than admission for an ER patient.  Plaintiffs are informed and believe that hospital administrators personally changed physician recommendations for observation to recommendations for in-patient admission.

---

[14] Statement of Facts ¶ 27, Attachment A to NPA; *see also id.* ¶¶ 30(c), (e).

112. The purpose of these activities was "to increase the number of [ER] patient admissions without regard to whether the admissions were medically necessary, all so that the HMA Hospitals could bill and obtain reimbursement for higher-paying inpatient hospital care, as opposed to observation or outpatient care, from Federal healthcare programs, and increase HMA's revenue." [15] HMA's fraud also resulted in higher reimbursement for private payors.

113. HMA's diagnostic testing and admissions benchmarks imposed standards on its hospitals far beyond national norms and averages and supplanted independent medical judgment with business decisions solely designed to generate revenue. HMA and its Division leadership applied unrelenting pressure on MEMA and its ER physicians to meet its fraudulent benchmarks.

*HMA Executives Closely Monitor Hospital Admissions*

114. In July 2008, HMA began using its "Executive Dashboard Reports" to police and enforce corporate benchmarks aimed at driving up revenues through ER diagnostic tests and in-patient admissions. Aided by these reports, HMA required its hospitals to scrutinize ER physicians' testing and admission decisions in a real-time and on daily, weekly, and monthly bases to pressure ER physicians and ER staff to meet HMA benchmarks in order to optimize revenue.

115. HMA corporate and Division executives exerted complete control over HMA hospital ERs. Given the importance of ER revenue to HMA's overall financial strategy, HMA corporate executives monitored each ER using these dashboard reports to assess each hospital's performance against its fraudulent benchmarks.

116. In fact, Newsome's office in HMA's corporate headquarters in Florida contained monitors whereby he could scrutinize, in real time, every ER against HMA's corporate benchmarks including patient admissions. HMA executives used this real-time data to identify

---

[15] *Id.*

and exert pressure on ER physicians to meet fraudulent benchmarks and to pressure its hospitals to replace ER physician groups who failed to do so.

117.   In August 2008, HMA executives intensified their efforts to enforce corporate ER benchmarks by instituting Daily ER Flash Meetings.  At these meetings, held in every HMA hospital ER each morning, HMA required its hospital executives to review the prior day's ER activity, as reflected in the Dashboard Reports, and demand the ER physicians explain why corporate ER benchmarks were not met.[16]  HMA hospital executives and administrators were business people, trained to make business decisions, not medical school graduates who are trained to treat patients.

118.   Mr. Michael Cowling ("Cowling"), who was a former CEO at Lake Norman Hospital, experienced the brunt of the pressure being exerted on hospitals by HMA's corporate and division executives who closely monitored the financial performance of the ERs. His lack of commitment to HMA's corporate benchmarks cost him his job. After being terminated in 2009, Cowling filed his own *qui tam* complaint in July 2011—while Plaintiffs' *qui tam* complaint was still under seal—alleging violations of the federal FCA (the "Cowling Complaint").[17]  Even though the Cowling Complaint and the Plaintiffs' federal FCA complaint were both filed under seal, their allegations are strikingly similar.

---

[16]*See* Statement of Facts ¶ 30(c), Attachment A to NPA ("HMA executives ordered HMA Hospital administrators to interrogate EMD physicians about alleged 'missed' admissions and admission overrides during daily meetings which was [sic] designed to improperly pressure the EMD physicians to admit patients who did not require inpatient admission.").

[17] The Cowling Complaint is hereby incorporated by this reference and can be found at: *United States ex rel. Meyer v. Health Management Associates, Inc.*, Civil Action No. 0:11-cv-01713-JFA (D.S.C.); https://ecf.scd.uscourts.gov/doc1/16315056308; also available at: https://www.corporatecrimereporter.com/wp-content/uploads/2014/01/emcare.pdf.

119.    Shortly after returning to HMA from CHS, Newsome informed Cowling that he "need[ed] [Lake Norman Hospital] to be one of the leaders in emergency room volume growth" and that the purpose of the testing protocols was to "drive admissions." [18]

### *Plaintiffs Complain of Fraud When HMA Releases Revised CTM Guidelines*

120.    On or about October 23, 2008, HMA released revised CTM Guidelines, which were created by Pro-MED and EmCare.  For each chief complaint, the revised CTM Guidelines identified, among other things, the tests triggered upon selection by the triage nurse and whether the tests were mandatory or discretionary.  As with the original CTM Guidelines, the emergency physician could not delete any "mandatory" tests, even where medically unnecessary.  Only mandatory tests were counted for meeting HMA's corporate revenue budget-driven benchmarks.

121.    HMA implemented these revised CTM Guidelines at each of its hospitals and maintained its corporate benchmark that emergency physicians order 80% of the tests recommended by the CTM Guidelines.  Tests ordered by the emergency physician after examining the patient did not count toward meeting HMA's testing benchmark.  Plaintiffs were alarmed to discover that the revised CTM Guidelines required ERs to order even more blatantly fraudulent and medically unnecessary tests.

122.    Dr. Mason immediately complained about the CTM Guidelines – that they required the ordering of medically unnecessary tests – to Cowling.  When Cowling presented the HMA testing protocols to MEMA, MEMA physicians "concluded that their implementation at [Lake Norman Hospital] would result in medically unnecessary tests and hospitals admissions."  MEMA physicians told "Cowling that the HMA[] directives were clinically wrong, and that legal counsel

---

[18]Cowling Complaint ¶ 122.

with whom MEMA consulted had advised the physicians that the procedures they were being told to follow were fraudulent."[19]

123.   Cowling communicated MEMA's concerns to HMA executives, including Newsome, Reynolds, and Vickie Briggs, then Division 1 President.  Cowling "[e]xplained that his doctors had concluded that adherence to the protocols would result in medically unnecessary tests and admissions."  After Cowling told Newsome "My docs won't do it," Newsome told him, "Do it anyway."[20]  Thus, at the time, HMA knew that the Plaintiffs were engaged in active efforts to stop violations of federal and state FCAs by attempting to avoid the medically unnecessary testing and hospital admissions that generated fraudulent revenue for HMA.

124.   When Cowling met with MEMA physicians again, the MEMA physicians "reaffirmed their conviction that HMA's directives were fraudulent."[21]  Cowling confirmed HMA's expectation that emergency physicians, including those at Lake Norman Hospital, must meet the corporate benchmark of 80% for diagnostic test orders.

125.   In late 2008, Dr. Mason complained to West, HMA's corporate director of emergency services, that the CTM Guidelines involved fraud and abuse that put all parties involved at legal and regulatory risk.

126.   On October 29, 2008, Briggs and Chris Hilton, Division 1 CFO, asked to meet with Dr. Folstad, then MEMA President.  During the meeting, Hilton falsely accused MEMA of not taking good care of HMA's patients because its emergency physicians were not ordering enough tests and not admitting enough patients.  Dr. Folstad rejected this assertion and asked for, as had

---

[19]*Cowling Complaint* ¶ 125.
[20]*Cowling Complaint* ¶ 126.
[21]*Cowling Complaint* ¶ 127

other MEMA doctors, any evidence supporting HMA's contentions that the mandated tests were medically necessary. No such evidence was ever produced.

127. As HMA increased its focus on ER adherence to its fraudulent benchmarks, Plaintiffs challenged HMA to provide clinical support for its ER benchmarks. In the fall of 2008, acting Division I CEO Vicki Briggs met with MEMA physicians at Lake Norman, who demanded that she provide clinical data supporting HMA's ER benchmarks within the Pro-MED system. Neither Briggs nor HMA ever provided any such clinical data. In late October 2008, Briggs notified Newsome of Plaintiffs' refusal to adhere to corporate benchmarks, assuring Newsome that she would reiterate HMA's expectation that such benchmarks must be met and suggesting that at least one MEMA physician should be replaced for refusal to comply with HMA's ER benchmarks.

128. Briggs asked Dr. Folstad if MEMA was going to cooperate with HMA's new ER incentives and threatened that, if MEMA would not cooperate, HMA would find an ER group that would.

129. Because HMA had eliminated any flexibility in the use of the CTM Guidelines, Dr. Mason sought to avoid unnecessary tests by training ER triage nurses at Lake Norman Hospital to select benign chief complaints that would trigger minimal diagnostic tests in the Pro-MED system. MEMA physicians at Davis Hospital also attempted to circumvent HMA's fraudulent guidelines by compiling a list of chief complaints that initiated little or no testing and posting it at the triage desk for use by the triage nurses. Once hospital administrators learned of these efforts, they prohibited them.

130. MEMA physicians at Lake Norman Hospital and Davis Hospital also sought to reduce the number of unnecessary tests ordered by reviewing test orders and attempting to cancel those not medically necessary. To respond to HMA's challenges regarding cancelled tests, Dr.

Mason and Dr. Folstad asked MEMA physicians at their respective hospitals to consistently document the reasons for cancellations.

131.    HMA pressured ER Directors to assist in mandating compliance with the CTM Guidelines by implementing a practice that the ER Directors present the CTM Guidelines to hospital MECs for approval. Lake Norman Hospital's CEO made clear to Dr. Mason that the CTM Guidelines must be used or MEMA's contract would be terminated. HMA also threatened the MEMA physicians at Davis Hospital with contract termination unless they presented the CTM Guidelines to the MEC for approval.

132.    HMA and Division executives repeatedly threatened Plaintiffs with contract termination for failure to participate in its fraud, communicating through their hospital executives that if MEMA did not meet HMA's testing and admission benchmarks, HMA would terminate MEMA and its physicians and replace them with an emergency physician group that would.

133.    In early January 2009, Dr. Mason met with Cowling and reported that the CTM Guidelines were clearly fraud and interfered with the ER physicians' independent medical judgment. Dr. Mason told Cowling that Plaintiffs would not use them.

134.    Cowling agreed with Dr. Mason that the CTM Guidelines were excessive and meant to generate revenue, not improve quality. However, Cowling told Dr. Mason that if Plaintiffs would not follow the CTM Guidelines, HMA had instructed him to terminate Plaintiffs and find a medical group that would comply. Cowling communicated Dr. Mason's fraud and abuse concerns about the CTM Guidelines to HMA executives, including Briggs and Britt Reynolds, who had recently become HMA Division I President after being recruited from CHS by Newsome.

37

135.    On January 13, 2009, Cowling communicated with both Lake Norman Hospital and Division I executives regarding Plaintiffs' refusal to support HMA's CTM Guidelines and its admissions benchmarks.

136.    In response to corporate pressure, Cowling recounted "strong discussions" with Dr. Mason, in particular, aimed at modifying MEMA's behavior. Cowling questioned whether Dr. Mason's continued opposition to the guidelines necessitated his replacement. As Cowling asserted in his *qui tam* complaint against HMA for federal FCA violations and other causes of action, HMA ultimately terminated Cowling's employment due to his inability to secure Plaintiff's acquiescence to HMA's fraudulent testing and admissions directives.

137.    On January 23, 2009, Dr. Mason discussed the CTM Guidelines with HMA's quality review consultant, Lisa Nummi, RN, CNP ("Nummi"). After Dr. Mason explained his concerns with the guidelines and Defendants' use of Pro-MED in general, Nummi agreed that the CTM Guidelines generated fraudulent and unnecessary tests for the sole purpose of revenue generation. Nummi relayed the substance of her conversation with Dr. Mason to Lake Norman Hospital CEO Cowling, CNO Rebecca Dunlap, and Division 1 executives Reynolds and Briggs. Nummi later assured Dr. Mason that she had also relayed his concerns to Riner, HMA's CMO.

138.    On January 27, 2009, Dr. Mason and Dr. Folstad attended a meeting with Lake Norman Hospital and Davis Hospital administrators (Cowling from Lake Norman Hospital and Metz from Davis Hospital) to discuss the doctors' complaints about fraud and the pressure HMA was placing on hospital CEOs to use the Pro-MED system.

139.    Dr. Folstad followed this meeting with an e-mail to Metz stating that, "It saddens me that the health care of human beings has been reduced to a bunch of statistics, and even more that it is done under the guise of quality. Last fall when I met with Chris Hilton, an accountant

who would not know his aorta from his adenoids, he sat there with his reams of data and pretty blatantly accused us of not taking good care of our patient; because we did not meet his statistical benchmarks."

*Plaintiffs Attempt to Work with HMA to Reduce the CTM Guidelines To Non-Fraudulent Levels and Avoid Unnecessary Admissions*

140.   Through the fall of 2008 into 2009, Dr. Mason repeatedly contacted HMA executives, as well as Lake Norman Hospital and Davis Hospital executives, and offered to assist HMA and EmCare in reducing the CTM Guidelines to acceptable medical levels.

141.   On December 23, 2008, Alice Gosfield, Esq., a nationally-known healthcare lawyer and counsel for MEMA, wrote on MEMA's behalf to Riner, HMA's business consultant and acting CMO, requesting clarification on the implementation of the CTM Guidelines. Gosfield's letter conveyed MEMA's concerns regarding the lack of clinical evidence supporting the use of the CTM Guidelines, which were aligned with MEMA's concerns regarding QualCheck's instigation of unnecessary in-patient admissions. The letter expressed MEMA's concerns that they were no longer afforded flexibility regarding lab tests or avoiding unnecessary admissions. Gosfield's letter concluded with the admonition that she could not fully advise her client as to their potential liability for fraud, given "the current context of overuse in Medicare," without understanding the "clinical predicate" for HMA's programs. Riner never provided any such support for HMA's budget-driven ER initiatives.

142.   On January 27, 2009, Lake Norman Hospital and Davis Hospital CEOs (Cowling and Metz), their ER Medical Directors (Drs. Mason and Greer), and Dr. Folstad met to discuss Plaintiffs' concerns about the ordering of unnecessary tests and the pressure the HMA hospital CEOs were under to use Pro-MED's systems.

39

143. In response to Dr. Mason's criticism of the CTM Guidelines, Karen Metz, Davis Hospital CEO, invited Dr. Mason to participate in a Task Force meeting at HMA's headquarters in Naples, Florida to change the CTM Guidelines.

144. Shortly before the Task Force meeting, Dr. Mason discussed the CTM Guidelines over the telephone with Riner. Dr. Mason complained that the CTM Guidelines constituted fraud and abuse. Riner responded privately to Dr. Mason that he would leave HMA if the CTM Guidelines were not changed.

### *HMA Revises its CTM Guidelines to <u>Increase</u> the Already-Inflated Number of Diagnostic Tests*

145. On February 3, 2009, the Task Force met at HMA's Naples, Florida headquarters to review and purportedly change the CTM Guidelines. EmCare's Dr. Michael Wheelis ("Wheelis") moderated the meeting, and attendees included HMA executives, HMA hospital emergency physicians, EmCare executives, and Dr. Mason. At the outset of the meeting, attendees were presented with CTM Guidelines that had been used at CHS and which required more medically-unnecessary diagnostic tests than were currently being mandated.

146. Dr. Mason understood that the attendees would discuss changes to the CTM Guidelines that would reduce the number of tests automatically ordered by HMA's triage nurses; however, he was one of only two outspoken critics of the guidelines. No EmCare physicians advocated for reducing the number of tests mandated by the CTM Guidelines.

147. On February 5, 2009, the Riner Group provided HMA executives and Task Force meeting attendees with revised CTM Guidelines. HMA did not make the changes Dr. Mason requested at the meeting. In fact, rather than reducing the number of tests ordered at triage, HMA's CTM Guidelines actually <u>increased</u> the number of fraudulent tests ordered. Riner informed the

40

recipients that the CTM Guidelines could not be further edited or reduced locally by the hospitals, only augmented.

### *Fraudulent Tests and Admissions by HMA, Lake Norman Hospital, and Davis Hospital Continue Despite Plaintiffs' Efforts to Stop the Fraud*

148.     HMA's CTM Guidelines continued to cause the submission of many false claims for thousands of unnecessary tests tied to specific chief complaints.

149.     After the February 3, 2009 meeting, HMA continued to mandate that CTM Guidelines tests be ordered at the time of triage, before the patient was seen by an ER physician. Throughout 2009, HMA corporate executives also continued to exert extreme pressure on Plaintiffs to increase hospital admission at Lake Norman Hospital and Davis Hospital, without regard to medical necessity and despite conceding, in internal communications, that Plaintiffs were not "missing" otherwise proper hospital admissions.

150.     Additionally, throughout 2009, HMA executives continued to pressure ER Directors at Lake Norman Hospital and Davis Hospital to meet corporate benchmarks for "attendings called" rates, directing ER Directors to immediately increase existing benchmarks. HMA has admitted it benchmarked "attendings called" not for any legitimate reason but solely to increase hospital admissions.

151.     HMA's policy and practice of pressuring ER physicians to order unnecessary tests and facilitate unnecessary admissions interfered with Plaintiffs' treatment decisions and resulted in thousands of unnecessary tests and admissions.

### *HMA Initiates Chart Reviews as a Pretext to Terminate MEMA*

152.     In 2009, HMA retained "quality review" consultants to scrutinize Plaintiffs' ER patient charts in an effort to find a pretext for criticism.  However, each consultant concluded that Plaintiffs work was of the highest quality.

153.     First, in January 2009, HMA had Nummi conduct a three-day review Plaintiffs'

patient charts from Lake Norman Hospital and Davis Hospital.  After reviewing 100 charts from

each facility, Nummi reported to HMA that Plaintiffs provide high quality emergency care, did

not discharge any patients that should have been admitted, and maintained some of the best

documentation across HMA's hospital system.

154.     Later, from December 2009 until February 2010, HMA and EmCare, through

EmCare physician Wheelis, conducted another so-called "quality review" of Plaintiffs' patient

charts from Lake Norman Hospital and Davis Hospital.  Unlike Nummi's review, the EmCare

review was a sham, ordered and orchestrated by Marchi, a HMA Division I executive with

oversight of both Lake Norman Hospital and Davis Hospital.  HMA and EmCare coordinated the

bogus review of MEMA solely in response to "significantly diminishing benchmarks" (i.e., refusal

to meet HMA's fraudulent ER benchmarks) at those hospitals and admittedly a pretext for

interfering with and ultimately terminating Plaintiffs' ER contracts.

155.     Wheelis performed his review of Plaintiffs' patient charts in or around January

2010. After performing his chart review, but before meeting with MEMA, Wheelis assured HMA

that, no matter what the charts revealed in terms of appropriateness of MEMA's medical care,

EmCare would do as HMA directed and whatever HMA thought was best. EmCare had its sights

on the Lake Norman Hospital and Davis Hospital contracts as early as July of 2009.

156.     Wheelis reviewed charts for patients who were discharged after being selected for

admission by Pro-MED's Quality Review software over a four-month period. Despite finding no

actual deficiencies in medical care during his "quality review," Wheelis reported findings to

Marchi that fulfilled EmCare's promise to do "whatever HMA wanted."  Wheelis untruthfully told

Marchi that he disagreed with the majority of the MEMA physicians' decisions on discharging

patients, finding that he would have admitted or, at a minimum, performed further testing, on most of the patients Plaintiffs discharged. HMA and EmCare used these false findings to manufacture a justification to terminate Plaintiffs' contract.

### *MEMA Physicians Continue to Provide Outstanding Patient Care*

157.     Despite what Wheelis reported to Marchi, he told Dr. Mason and Dr. Folstad, and a group of other MEMA physicians from Lake Norman Hospital and Davis Hospital, in the presence of HMA's Lake Norman Hospital then-CEO, Greg Lowe, that MEMA ER physicians provided excellent care. In person, Wheelis gave MEMA physicians high praise for both quality of care and charting – the two core services MEMA agreed to provide under its professional services agreements with the hospitals. He described the MEMA providers at Lake Norman Hospital and Davis Hospital as an excellent group of physicians. Wheelis added: "If I wreck going back to Charlotte tonight, I hope that one of your doctors takes care of me."

158.     According to the Cowling Complaint, Wheelis reported that "MEMA was one of the most professional groups of doctors he had ever worked with and that he had not uncovered any quality concerns or 'missed admissions.'"[22]

159.     Thus, HMA's "quality reviews" demonstrated Plaintiffs were strong performers and rendered high-quality emergency care despite constant pressure from HMA to order excessive tests and unnecessarily admit patients to Lake Norman Hospital and Davis Hospital.

160.     HMA internally recorded high patient satisfaction scores earned by Plaintiffs and noted the high quality of Plaintiffs' services over the years.  For example, in February 2010, the ER physician scores earned by MEMA physicians at Lake Norman Hospital exceeded HMA's overall corporate scores.

---

[22]*Cowling Complaint* ¶ 132.

161.    In the years leading to Plaintiffs' termination, and even during the period when HMA criticized Dr. Mason specifically for opposing its fraudulent practices, HMA executives universally recognized the quality of Plaintiffs' medical care.  HMA specifically boasted of Dr. Mason's stature in the medical community.  For example, in its internal Lake Norman Hospital ER Report, dated February 4, 2009, HMA executives praised the quality of Plaintiffs' ER care and specifically touted Dr. Mason's leadership in state and national emergency medicine organizations, including the American College of Emergency Physicians.

162.    In February 2009, Riner, HMA's CMO, touted Dr. Mason's status as a national emergency board examiner and involvement in the American College of Emergency Physicians to give credence to the CTM Guidelines, boasting that some of the Task Force members were "examiners for the American [College] of Emergency Physicians."

163.    Because MEMA and its ER physicians strove to make testing and hospital admissions recommendations based on their exercise of independent medical judgment and patient need, and not for the purpose of meeting fraudulent benchmarks designed to generate revenue to meet a budget unrelated to medical necessity, Lake Norman Hospital and Davis Hospital often failed to meet HMA's benchmarks.

164.    HMA's corporate benchmarks also measured the time it takes to process the patient through the ER, the average length of stay ("ALOS"), and the number of patients who leave without treatment ("LWOT") or against medical advice ("AMA").  Plaintiffs agree these benchmarks can impact patient satisfaction and quality of care.

165.    Lake Norman Hospital and Davis Hospital ERs performed well against AMA, LWOT and ALOS benchmarks set by HMA.  As of January 2010, both hospitals were well below HMA's benchmark for AMA and LWOT of less than 2%.  In addition, the ALOS for both Lake

Norman Hospital and Davis Hospital were much shorter than most HMA hospitals and well below the national average of four and one-half hours.

### *HMA Offers Kickbacks to Induce MEMA Physicians to Generate Medically Unnecessary Diagnostic Tests and Admissions*

166. HMA provided kickbacks to emergency medicine practices who were complying with their benchmarks for unnecessary tests and unnecessary admissions by renewing or awarding them lucrative ER contracts. HMA discharges ER physicians who do not meet HMA's performance standards for unnecessary tests and admissions.

167. HMA has paid, and EmCare has accepted, kickbacks, at least in part, to induce EmCare physicians to recommend or refer patients to HMA hospitals for services which are paid by federal and state healthcare programs. These kickbacks include EmCare's retention of existing lucrative HMA contracts, as well as HMA's awarding of new ER contracts and hospitalist services contracts to EmCare. For example, following its termination of Plaintiff's contract, HMA awarded both the Lake Norman ER and hospitalist contracts to EmCare as a financial inducement to EmCare to refer patients for hospital services, including ER testing and admissions.

168. In light of Plaintiffs' resistance to HMA's efforts to employ fraudulent ER practices at Lake Norman Hospital and Davis Hospital, HMA offered Plaintiffs cash "awards" to meet its unlawful corporate ER benchmarks. Plaintiffs refused HMA's offers of cash inducements as illegal kickbacks to meet testing and admissions benchmarks.

169. Shortly after becoming Lake Norman Hospital CEO in mid-2009, Lowe offered cash incentives to MEMA if they met the hospital's fraudulent benchmarks. On or about June 22, 2009, Lowe proposed to Dr. Mason that HMA could pay cash incentives in exchange for Lake Norman Hospital's ER meeting its revenue-driven benchmarks, including those relating to patient admissions and tests ordered. Dr. Mason categorically rejected Lowe's illegal offer of incentives,

telling Lowe that MEMA physicians always strive for excellence in the benchmarks related to quality patient care. Dr. Mason told Lowe that he considered the offer a bribe and that it was "fraud and abuse." In response, Lowe became angry and said, "everyone does this kinda thing," adding that he had "done it before"[23]

170. After Plaintiffs rejected HMA Defendants' attempts to bribe them with illegal cash inducements in exchange for meeting corporate ER benchmarks, Defendants' harassment of Plaintiffs intensified. In contrast, EmCare freely accepted HMA's illegal inducements.

### HMA, Lake Norman Hospital, and Davis Hospital Ignore Plaintiffs' Complaints of Fraud

171. Plaintiffs repeatedly complained about HMA's fraudulent schemes at every level of HMA's corporate structure, beginning with the hospital CEOs and reaching to HMA CEO Newsome, and Bill Schoen, Chairman of HMA's Board of Directors.

172. Plaintiffs continued to warn HMA and its agents, Division executives, hospital executives, and consultants that ordering and billing government and other payors for unnecessary tests and admitting patients unnecessarily amounted to healthcare fraud.

173. HMA knew that unnecessarily admitting patients would expose those patients to all of the risks inherent to hospital admission – including hospital-acquired illnesses. In the Medicare-aged population, the risk of hospital acquired infections is even greater in light of compromised immune systems that often affect the elderly. Ordering unnecessary diagnostic tests exposed young children to more needle sticks for no other purpose than to meet HMA's artificial revenue benchmarks.

---

[23]*See* Statement of Facts ¶ 26, Attachment A to NPA ("As part of the scheme to defraud, HMA offered and paid unlawful remuneration to [EmCare], in the form of service contracts at HMA Hospitals and payments, in return for [ER] inpatient admission recommendations and admissions at HMA Hospitals that were not medically necessary."); *see also* Statement of Facts ¶ 30(g), Attachment A to NPA

46

174. Plaintiffs continued to take proactive steps to avoid engaging in healthcare fraud and to neutralize the effects of HMA's fraudulent schemes at Lake Norman Hospital and Davis Hospital.

175. On August 25, 2009, Dr. Mason and Dr. Folstad, along with Dr. Greer, then ER Director at Davis Hospital, met with HMA executives Lowe, Reynolds, and Marchi. Reynolds told the physicians that MEMA was HMA's best ER group. However, Reynolds stated he would end the meeting and call their lawyers if the MEMA physicians wished to again discuss fraud and abuse.

176. Two months after the August 25, 2009 meeting, Marchi, Division 1 Vice President, told Plaintiffs that they must implement the Pro-MED programs "as is" or be terminated.

177. In October 2009, Marchi told Dr. Folstad that Pro-MED software and testing guidelines were "here to stay" and that Plaintiffs must "work with us or you are gone." Marchi added that Dr. Folstad needed to get Dr. Mason (at the time the most vocal critic of HMA's illegal testing and admissions practices) "under control." Plaintiffs understood Marchi's comments to mean that if they did not follow the CTM Guidelines and QualCheck admission recommendations and also meet HMA's other ER benchmarks aimed at increasing revenues, they would be terminated.

### *EmCare Interferes with the Lake Norman Hospital Agreement and the Davis Hospital Agreement*

178. In order for the EmCare Defendants to maximize its financial benefits under the PPPA with HMA, they sought to induce hospital administrators to terminate MEMA's Lake Norman Hospital Agreement and Davis Hospital Agreement so that EmCare could bid on them.

179. The EmCare Defendants also set out to destabilize MEMA, which at the time was the largest group of board-certified emergency physicians in the Charlotte area. The EmCare

Defendants knew the loss of the Lake Norman Hospital Agreement and the Davis Hospital Agreement would cause physicians to leave MEMA, thus weakening its competitive position in the Charlotte market.

180.    EmCare sought to bring about the termination of the Davis Hospital Agreement and the Lake Norman Hospital Agreement not for any legitimate purpose, but because it knew that HMA wanted to fraudulently increase revenues at these locations and was willing to participate in HMA's fraudulent schemes for its own financial benefit.

181.    In fact, for years EmCare worked with HMA at other hospitals to implement HMA's initiatives to fraudulently increase ER revenue through increased tests and hospital admissions. HMA has admitted that EmCare "executives and administrators collaborated with HMA executives and HMA Hospital administrators in presuming and inducing [ER] medical directors and physicians to recommend the hospitalization of [ER] patients who did not need and did not qualify for inpatient admission."[24]

182.    In October 2009, as EmCare demonstrated its willingness to conspire with HMA's effort to fraudulently drive up revenues, HMA informed EmCare's Wheelis that the Lake Norman Hospital Agreement and the Davis Hospital Agreement "would be coming [their] way." A few months later, Wheelis performed perfunctory chart reviews of Plaintiffs' patients at the request of HMA executives to help HMA create a pretext for terminating Plaintiffs' Lake Norman Hospital Agreement and Davis Hospital Agreement. After performing his chart review, but before meeting with MEMA, Wheelis assured HMA that, no matter the outcome of his review, EmCare would do as HMA directed and adhere to "what HMA thinks is best" with regard to MEMA.

---

[24]Statement of Facts ¶ 31, Attachment A to NPA; *see also* Statement of Facts ¶¶ 31(a)-(f), Attachment A to NPA

183.    On April 30, 2010, EmCare and Lake Norman Hospital executed an agreement granting EmCare the exclusive right to provide ER services at Lake Norman Hospital beginning October 30, 2010 (the "EmCare Contract"), even though Lake Norman Hospital had not yet terminated its contract with MEMA.  Lake Norman Hospital awarded the EmCare Contract to secure EmCare's cooperation with HMA's fraudulent ER testing and hospital admissions schemes.  Indeed, the EmCare Contract itself provided for bonuses based on EmCare meeting the corporate revenue budget driven benchmarks.

### *HMA Maliciously Terminates the Lake Norman Hospital Agreement and the Davis Hospital Agreement*

184.    Since the fall of 2008, Plaintiffs were told that their ability to retain their two ER contracts with HMA depended on their willingness to meet HMA's corporate revenue driven ER benchmarks on diagnostic tests ordered and admissions of ER patients.  By late October 2008, Newsome and Curry, HMA COO, began discussing plans to replace Plaintiffs based on their refusal to comply with HMA's benchmarks designed to increase revenue through unnecessary tests and in-patient admissions.

185.    In May 2009 and thereafter, HMA and Division I executives began specifically discussing the prospect of replacing MEMA with EmCare at Lake Norman Hospital based on EmCare's willingness to support HMA's fraudulent ER benchmarks.  By December 16, 2009, EmCare was in discussion with both Lake Norman Hospital and Davis Hospital to displace and take over both ER contracts.

186.    In January 2010, Dr. Mason refused to recommend that the Lake Norman Hospital MEC approve the CTM Guidelines based on the medically unnecessary and fraudulent diagnostic testing they generated.  Lowe was angry that Dr. Mason and MEMA did not "fall in line" and approve HMA's Pro-MED CTM Guidelines.

187.     In February 2010, HMA and hospital management removed Dr. Mason as Division

1 representative to HMA's ER Core Committee. The decision to replace Dr. Mason was based on

his refusal to support the revised CTM Guidelines and its fraudulent benchmarks.

188.     In the winter and spring of 2010, Dr. Mason repeatedly reported to Lowe, CEO at

Lake Norman Hospital, that HMA's review of ER data was an attempt to coerce ER physicians

into ordering medically unnecessary tests and admitting patients unnecessarily.  In response, Lowe

threatened to fire MEMA and hire an ER group that would comply with HMA's ER fraud.

189.     On May 3, 2010, Lake Norman Hospital provided notice, both orally and in writing,

to MEMA's President, Dr. Folstad, that they were terminating the Lake Norman Hospital

Agreement with MEMA, effective November 3, 2010.  That same day, hospital executives at Davis

Hospital provided similar notice to MEMA's President, Dr. Folstad, that it was terminating the

Davis Hospital Agreement with MEMA effective August 31, 2010.

190.     In July 2010, after HMA directed the termination of the Lake Norman Hospital

Agreement and the Davis Hospital Agreement, EmCare executives and Lake Norman Hospital

executives entered into an amendment to the EmCare Contract, to be effective on April 30, 2010

- the same day the EmCare Contract was signed.

191.     Under the terms of the illicit amendment, signed by EmCare's Regional CEO Terry

Meadows and Lake Norman Hospital's CEO Greg Lowe, EmCare agreed to compensate Lake

Norman Hospital for damages caused to MEMA as a result of EmCare's intentional interference

with the Lake Norman Hospital Agreement and the hospital's termination of that agreement.[25]

HMA's estimate of potential damages to MEMA assumed that the termination of two of MEMA's

ER contracts would cause MEMA to lose nearly 60 board-certified emergency physicians. In the

---

[25] A copy of the amendment is attached hereto as Exhibit B and incorporated herein by this reference.

end, neither EmCare nor Lake Norman Hospital ever paid any damages to MEMA resulting from EmCare's intentional interference with and the hospital's unlawful termination of the Lake Norman Hospital Agreement.

192.     These HMA subsidiaries terminated the Lake Norman Hospital Agreement and the Davis Hospital Agreement at HMA's direction, without cause, and solely in response to Plaintiff's complaints of HMA's blatant fraud, Plaintiffs' efforts to stop the fraud, and Plaintiffs' refusal to participate in the fraud.  HMA's incentive to interfere with and effectuate the termination of those contracts is clear – Plaintiffs' refusal to adhere to HMA's fraudulent testing and admission benchmarks cost HMA, at a minimum, $300,000 per month in diagnostic testing revenue alone.

193.     EmCare's incentive to conspire with HMA and interfere with MEMA's contracts is also clear – EmCare gained the opportunity under the PPPA to bid on two new hospitals, including contracts for the ER and for hospitalist services.  EmCare secured the ER and hospitalist contracts at Lake Norman Hospital.  EmCare also disabled its main competition in the Charlotte market by de-stabilizing a group of highly-regarded board-certified ER physicians whom EmCare hoped to prey upon to staff their commitments under the EmCare Contract.

194.     Until its unlawful terminations from Lake Norman Hospital and Davis Hospital, MEMA had never lost an ER contract. It had provided ER coverage under professional services agreements for five hospitals: Lake Norman Hospital; Davis Hospital; and three Novant hospitals f/k/a Presbyterian hospitals ("Novant Hospitals") in Mecklenburg County.  MEMA has been unable to replace its multi-million-dollar contracts with Lake Norman Hospital and Davis Hospital since Defendants' unlawful termination of and interference with those contracts, despite repeated efforts to do so.

51

195.    In contrast, MEMA's ER contracts with the three Novant Hospitals remain in effect having been renewed consistently since their inception: over 40 years for Presbyterian Medical Center, which became effective in 1978; over 25 years for Matthews Medical Center, which became effective in 1994; and over 15 years for Huntersville Medical Center, which became effective in in 2003.

196.    Plaintiffs' continuing refusal to participate in HMA's and EmCare's fraudulent scheme came at great cost.  As a result of the HMA Defendants' and the EmCare Defendants' actions, Plaintiffs have suffered millions of dollars in damages, including lost profits and other consequential damages. MEMA lost over 20 physicians because of the HMA Defendants' wrongful and unlawful termination of the Lake Norman Hospital Agreement and the Davis Hospital Agreement and EmCare Defendants' unlawful interference with those contracts.

### HMA Defames and Slanders the ER Physicians at MEMA, Including Dr. Mason and Dr. Folstad

197.    Plaintiffs' reputations and professional standing have been tainted in their medical community based on Defendants' slandering of Plaintiffs in the community with respect to the reason for their abrupt termination.

198.    For example, within days of the issuance of the May 3, 2010 termination notices, Greg Lowe told the Lake Norman Hospital Board of Directors that Plaintiffs were terminated because they were not committed to HMA's quality program or improving their patient satisfaction scores. Lowe knew this statement about MEMA's quality of patient care was false at the time he made it because Lowe later admitted privately to CEO Newsome, when discussing the reason for MEMA's termination, that Plaintiffs' quality of patient care was never an issue.

199. Defendants falsely told numerous others in Plaintiffs' community that MEMA was terminated because of their ER physicians' failure to provide quality care and that they were not good doctors.

200. In spite of HMA's knowledge that MEMA provided the highest quality emergency care, HMA hospital executives and administrators made disparaging comments about the quality of MEMA's medical care in an attempt to justify their illegal termination of MEMA and disguise their own fraudulent and unlawful conduct.

201. On August 26, 2010, Dr. Mason sent an email to Lowe regarding the pending transition at Lake Norman Hospital from MEMA ER physicians. In the email, Dr. Mason notified HMA's hospital CEO that MEMA had "heard both by rumor and direct conversation with others that you and your staff have made some disparaging remarks about MEMA regarding our quality and patient satisfaction." Dr. Mason received no response whatsoever from Lake Norman Hospital or HMA.

202. On November 3, 2010, Dr. Folstad wrote to Lowe, HMA's hospital CEO at Lake Norman Hospital, regarding the slanderous remarks about MEMA's discharge that continued to be made, even after the August 26, 2010 e-mail. Again, no response was ever received from Lake Norman Hospital or HMA.

## FIRST CLAIM FOR RELIEF
### (Retaliation in Violation of the Federal FCA Against the HMA Defendants)

203. Plaintiffs re-allege ¶¶ 1-202 as though fully set forth herein.

204. The federal FCA, 31 U.S.C. 3730(h), protects an employee, agent, or independent contractor from retaliation for lawful acts done by the employee, agent or independent contractor in furtherance of an action under Section 3730 or other efforts to stop one or more violations of the federal FCA.

205.     MEMA was a contractor and agent of the HMA Defendants pursuant to the professional service agreements between MEMA and Lake Norman Hospital and Davis Hospital and by virtue of its exclusive performance of an inherent function of the hospitals on the hospitals' behalf and under the hospitals' control.  Dr. Mason and Dr. Folstad were contractors and agents of the HMA Defendants pursuant to the professional services agreements between MEMA and Lake Norman Hospital and Davis Hospital by virtue of their ownership interest in MEMA and by virtue of their exclusive performance of an inherent function of the hospitals on the hospitals' behalf and under the hospitals' control.

206.     Plaintiffs engaged in protected activity in furtherance of a federal FCA action and designed to stop one or more federal FCA violations. Among other things, Plaintiffs made repeated complaints to the HMA Defendants regarding the HMA Defendants' fraudulent practices, including but not limited to the HMA Defendants' ordering of medically unnecessary diagnostic tests and hospital admissions, their fraudulent corporate benchmarks, and their illegal kickback proposals, all of which violated the federal FCA and other federal and state laws. Plaintiffs also refused to participate in, and made repeated efforts to stop, the HMA Defendants' violations of the federal FCA, the AKS, and other federal and state laws, as evidenced by their cancellation of fraudulent diagnostic tests, refusal to admit patients based on factors not tied to medical necessity, and rejection of kickbacks offered by the HMA Defendants in exchange for supporting their fraudulent schemes.

207.     The HMA Defendants had actual and direct knowledge of Plaintiffs' protected activity, as Plaintiffs' complaints of the HMA Defendants' fraudulent and unlawful practices were made directly to the HMA Defendants' executive management, both orally and writing, using language sufficient to put the HMA Defendants on notice that they were engaged in protected

54

activities. The HMA Defendants likewise had knowledge of Plaintiffs' refusal to participate in fraudulent practices and their efforts to stop the HMA Defendants' violations of the federal FCA and AKS, as Plaintiffs made such efforts known to the HMA Defendants and the HMA Defendants punished Plaintiffs, ultimately by termination of their contracts, because of Plaintiffs' efforts.

208.    The HMA Defendants retaliated against Plaintiffs as described above, by harassing them, threating them, and ultimately directing the termination of the Lake Norman Hospital Agreement and the Davis Hospital Agreement solely on account of their protected activity and not for any legitimate reason.

209.    Pursuant to 31 U.S.C. § 3730(h), Plaintiffs are entitled to "all relief necessary to be made whole," including "reinstatement with the same seniority status that the employee, contractor or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees."

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of the North Carolina FCA Against the HMA Defendants)**

210.    Plaintiffs re-allege ¶¶ 1-209 as though fully set forth herein.

211.    The North Carolina FCA, N.C. Gen. Stat. § 1-605 *et seq.*, protects an employee, agent, or independent contractor from retaliation for lawful acts done by the employee, agent or independent contractor in furtherance of an action under Article 51 or other efforts to stop one or more violations of G.S. § 1-607.

212.    MEMA was a contractor and agent of the HMA Defendants pursuant to the professional service agreements between MEMA and Lake Norman Hospital and Davis Hospital and because of MEMA's exclusive performance of an inherent function of the hospitals on the hospitals' behalf and under the hospitals' control. Dr. Mason and Dr. Folstad were contractors

and agents of the HMA Defendants pursuant to the professional service agreements between MEMA and Lake Norman Hospital and Davis Hospital, because of their ownership interest in MEMA, and because of their exclusive performance of an inherent function of the hospitals on the hospitals' behalf and under the hospitals' control.

213.    As set forth in the facts above, Plaintiffs engaged in protected activity by engaging in conduct in furtherance of a North Carolina FCA action and designed to stop one or more North Carolina FCA violations. Among other things, Plaintiffs made repeated complaints to the HMA Defendants regarding the HMA Defendants' fraudulent practices, including but not limited to their ordering of medically unnecessary diagnostic tests and hospital admissions, their fraudulent corporate benchmarks, and their illegal kickback proposals, all of which violated the North Carolina FCA and other federal and state laws. Plaintiffs also refused to participate in, and made repeated efforts to stop, the HMA Defendants' violations of the North Carolina FCA, the AKS, and other federal and state laws, as evidenced by their cancellation of fraudulent diagnostic tests, refusal to admit patients based on factors not tied to medical necessity, and refusal to accept kickbacks in exchange for supporting the HMA Defendants' fraudulent schemes.

214.    The HMA Defendants had actual and direct knowledge of Plaintiffs' protected activity, as Plaintiffs' complaints regarding the HMA Defendants' fraudulent and unlawful practices were made directly to the HMA Defendants' executive management, both orally and writing, using language sufficient to put the HMA Defendants on notice that they were engaged in protected activities. The HMA Defendants likewise had knowledge of Plaintiffs' refusal to participate in fraudulent practices and their efforts to stop the HMA Defendants' violations of the North Carolina FCA and AKS, as Plaintiffs made such efforts known to the HMA Defendants who

punished Plaintiffs, ultimately by directing the termination on their contracts, because of Plaintiffs' efforts.

215.    Defendants retaliated against Plaintiffs as described above by harassing them, threatening them, and ultimately terminating the Lake Norman Hospital Agreement and the Davis Hospital Agreement solely on account of their protected activity and not for any legitimate reason.

216.    Pursuant to North Carolina Gen. Stat. § 1-613, Plaintiffs are entitled to "all relief necessary to be made whole," including "reinstatement with the same seniority status that the employee, contractor or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."

### THIRD CLAIM FOR RELIEF
### (Tortious Interference with a Contractual Relationship Against the EmCare Defendants)

217.    Plaintiff MEMA re-alleges ¶¶ 1-216 as though fully set forth herein.

218.    MEMA had valid contracts with Defendants Lake Norman Hospital and Davis Hospital for the exclusive provision of ER services.

219.    The EmCare Defendants knew that these contracts were in place since 1996 and 2000, respectively.

220.    The EmCare Defendants intentionally induced Defendants Lake Norman Hospital and Davis Hospital to terminate the contracts with MEMA.

221.    The EmCare Defendants acted with improper purpose and without justification, in that EmCare's motives were not reasonably related to protecting a legitimate business interest. Instead, EmCare's motive was to further a scheme to commit healthcare fraud against federal and state government-sponsored healthcare programs, private healthcare insurers, and self-payor

patients. The EmCare Defendants also sought to destabilize MEMA by causing the loss of their ER physicians.

222. The EmCare Defendants' conduct caused actual damage to MEMA.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference with a Contractual Relationship Against CHS AND HMA)**

223. Plaintiff MEMA re-alleges ¶¶ 1-222 as though fully set forth herein.

224. MEMA had valid contracts with Defendants Lake Norman Hospital and Davis Hospital for the exclusive provision of emergency services.

225. Defendant HMA knew that these contracts were in place since 1996 and 2000, respectively. In fact, HMA's executives openly and repeatedly threatened Plaintiffs that they would terminate these contracts in retaliation for Plaintiffs' protected activity: namely, their refusal to cooperate with HMA's fraud and their efforts to avoid violations of the federal and state FCAs, and other crimes involving healthcare fraud.

226. Defendant HMA intentionally induced Defendants Lake Norman Hospital and Davis Hospital to terminate the contracts with MEMA.

227. Defendant HMA acted with improper purpose and without justification, in that HMA's motives were not reasonably related to protecting a legitimate business interest. Instead, HMA's motive was to further a scheme to commit healthcare fraud against federal- and state-government-sponsored health programs, private healthcare insurers, and self-payor patients. HMA also sought to destabilize MEMA by causing the loss of their ER physicians.

228. HMA's conduct caused actual damage to MEMA.

229. CHS is liable for damages caused by HMA as the successor-in-interest to HMA.

58

**FIFTH CLAIM FOR RELIEF**
**(Defamation and Slander Per Se Against the HMA Defendants)**

230.     Plaintiffs re-allege ¶¶ 1-229 as though fully set forth herein.

231.     Following the notice of termination provided to MEMA on May 3, 2010, the HMA Defendants caused injury to MEMA, Mason, and Folstad by making false statements concerning the Plaintiffs to third persons, including, but not limited to:

•     Statements by HMA's Lake Norman CEO, Greg Lowe, to the Lake Norman Board of Directors that MEMA was replaced because its ER physicians did not want to practice quality medicine and they refused to use HMA's quality program;

•     Defendants HMA, Lake Norman Hospital, and Davis Hospital told numerous other physicians that MEMA was terminated because of its failure to commit to HMA's quality program and because of MEMA's patient satisfaction scores.

232.     Each of these statements was false and touched the Plaintiffs in their special trade or occupation.

233.     The HMA Defendants made these statements in bad faith, with malice, and with a direct intent to harm Plaintiffs, and with reckless disregard for their rights. The HMA Defendants were aware at the time that they made these statements that they were false.

234.     The HMA Defendants made these statements knowing that they would cause great harm to the Plaintiffs, including great harm to their reputations.

235.     The HMA Defendants' conduct amounts to slander per se because these oral communications amount to allegations that impeach Plaintiffs in their business or professions.

## SIXTH CLAIM FOR RELIEF
### (Violation of the North Carolina Unfair and Deceptive Trade Practices Act Against the HMA Defendants and the EmCare Defendants)

236.     Plaintiffs re-allege ¶¶ 1-235 as though fully set forth herein.

237.     The HMA Defendants and the EmCare Defendants engaged in unfair and deceptive acts or practices, including, but not limited to the following:

a)      conducting the operations of ERs at HMA hospitals in the State of North Carolina in a manner which compelled physicians and physician groups, hospital staff and hospital administrators to participate in Defendants' fraud against government healthcare programs, private insurers, and consumers related to the ordering of unnecessary tests and the admission of patients without medical necessity at HMA hospitals;

b)      incentivizing or attempting to incentivize physicians to cooperate with Defendants' fraudulent practices;

c)      retaliating against MEMA's physician practices, including Dr. Folstad and Dr. Mason, and its other ER providers, who would not cooperate with Defendants' fraudulent practices;

d)      terminating, and causing the termination of MEMA's contracts with Lake Norman Hospital and Davis Hospital, because MEMA, Folstad, and Mason would not cooperate with Defendants' fraudulent practices;

e)      causing the submission of false claims for unnecessary medical services (ER testing, outpatient services, in-patient admissions) to state and local government healthcare programs, as well as to private insurers and self-payors;

f)      causing the payment of kickbacks by monetarily rewarding the referral of patients for inpatient hospital admissions when only outpatient treatment was necessary and by awarding ER contracts in exchange for conduct compliant with the fraudulent Pro-MED system;

g) eliminating and overriding physicians' medical judgment not to order diagnostic tests required by the CTM Guidelines in the Pro-MED system which generated fraudulent costs charged to public and private insurers and private payors;

h) engaging in a conspiracy to commit healthcare fraud; and

i) making false and malicious statements about Plaintiffs.

238. At all times relevant to the allegations contained herein, the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 *et seq.,* which proscribes unfair or deceptive acts or practices in or affecting commerce, was in full force and effect.

239. The HMA Defendants' and the EmCare Defendants' conduct constitutes unfair and deceptive acts or practices in or affecting commerce in North Carolina because it involves other market participants, including consumers and public and private insurers, as well as other competitor hospitals.

240. The HMA Defendants' and the EmCare Defendants' unfair and deceptive practices caused government and private insurers, as well as patients themselves, to be billed for unnecessary hospital services; the revenues from which affected the investment decisions of shareholders and other participants in publicly traded and privately held companies, including HMA and its competitors.

241. The HMA Defendants' and the EmCare Defendants' unfair and deceptive practices also resulted in EmCare acquiring 20 ER and hospitalist service contracts between 2008 and 2010, including two at Lake Norman (ER and hospitalist services). The revenues generated by EmCare's unfair and deceptive practices affected the investment decisions of shareholders and other participants in publicly traded and privately held companies, including the EmCare Defendants and their competitors.

242.     EmCare executives who formed the conspiracy with HMA benefitted by selling tens of millions of dollars in EmCare parent stock in 2014.

243.     The HMA Defendants' and the EmCare Defendants' conduct proximately caused actual injury to Plaintiffs.

244.     The HMA Defendants and the EmCare Defendants willfully and intentionally engaged in the unfair and deceptive acts for the purpose of proximately causing injury to Plaintiffs.

### SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy Against the HMA Defendants and the EmCare Defendants)

245.     Plaintiffs re-allege ¶¶ 1-244 as though fully set forth herein.

246.     The HMA Defendants and the EmCare Defendants agreed to engage in unlawful activity, including but not limited to

a)       tortiously interfering in MEMA's contracts with Lake Norman Hospital and Davis Hospital;

b)       violating the North Carolina Unfair and Deceptive Trade Practices Act; and

c)       retaliating against Plaintiffs for their refusal to participate in Defendants' fraudulent and unlawful practices.

247.     The HMA Defendants' and the EmCare Defendants' conduct proximately caused actual injury to Plaintiffs.

248.     Plaintiffs' actual injury was a result of the HMA Defendants and the EmCare Defendants acting pursuant to a common scheme, including:

a)       the submission of false and fraudulent claims in violation of the federal FCA and the North Carolina FCA;

b)       the termination of MEMA's contracts with Lake Norman Hospital and Davis Hospital; and

c)     the awarding of ER and hospitalist contracts between EmCare and HMA hospitals between 2008 and 2010, including the contract for EmCare to provide ER and hospitalist services at Lake Norman Hospital.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand that all issues of fact be tried by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.     That judgment be entered in an amount to be determined by a jury for Plaintiffs and against the HMA Defendants for violating 31 U.S.C. § 3730(h); and

2.     That judgment be entered for Plaintiffs and against the HMA Defendants for two times back pay, interest on the back pay, special damages, plus attorney's fees and costs, as authorized by 31 U.S.C. § 3730(h); and

3.     That judgment be entered in an amount determined by a jury for Plaintiffs and against the HMA Defendants for violating N.C. Gen. Stat. § 1-613; and

4.     That judgment be entered for Plaintiffs and against the HMA Defendants for two times back pay, interest on the back pay, special damages, and attorney's fees and costs, as authorized by Gen. Stat. § 1-607; and

5.     That judgment be entered for Plaintiffs and against all Defendants in an amount equal to three times the damages Plaintiffs have sustained because of Defendants' actions, plus attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16;

6.     That judgment be entered in an amount to be determined by a jury for Plaintiffs and against all Defendants for punitive damages pursuant to N.C. Gen. Stat. § 1D; and

7.      For such other and further relief as the court may deem just and proper.


        This the 26th day of April, 2019.

                                        Respectfully submitted,

                                        /s/ Thomas D. Myrick
James F. Wyatt, III                     Thomas D. Myrick
NC State Bar No. 13766                  N.C. State Bar No. 12645
Robert A. Blake, Jr., Esquire           Paul J. Peralta
NC State Bar No. 20858                  N.C. State Bar No. 34622
**WYATT & BLAKE, LLP**                  Emily C. Pera
435 East Morehead Street                N.C. State Bar No. 51317
Charlotte, NC 28202-2609                Ryan C. Grover
Tele. No.: (704) 331-0767               N.C. State Bar No. 53703
Fax: (704) 331-0773                     **Moore & Van Allen PLLC**
                                        Bank of America Corporate Center
Marc S. Raspanti                        100 North Tryon Street, Suite 4700
Admitted *Pro Hac Vice*                 Charlotte, North Carolina 28202
Pamela Coyle Brecht                     Telephone: (704) 331-1126
Admitted *Pro Hac Vice*                 Facsimile: (704) 331-1159
**PIETRAGALLO GORDON**                  Email: tommyrick@mvalaw.com
**ALFANO BOSICK & RASPANTI,**
**LLP**                                 ***Attorneys for Plaintiffs***
1818 Market Street, Suite 3402
Philadelphia, PA  19103
Tele. No.: (215) 320-6200
Fax: (215) 981-0082