# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:10-CV-00472-KDB

| | |
|---|---|
| THOMAS L. MASON, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> HEALTH MANAGEMENT ASSOCIATES, LLC, ET AL., <br><br> Defendants. | **ORDER** |

**THIS MATTER** is before the Court on Defendants' Motion for a Protective Order, Plaintiffs' Motion to Compel, and the parties' memoranda on damages. (Doc. Nos. 243, 255, 279, 280). Having considered the parties' briefs, exhibits, and oral argument on September 16, 2022, the Court will deny in part and grant in part both motions to the extent discussed below.

## I. BACKGROUND

This matter involves the alleged wrongful termination of Plaintiffs' contracts to provide emergency room coverage to two hospitals then owned and operated by Defendants. Plaintiffs contend that they were terminated because of a refusal to participate in a scheme to submit false claims to Medicare, Medicaid, and other government funded healthcare programs. Throughout this litigation, the parties have consistently been unable to resolve discovery disputes without the Court's intervention. This acrimonious discovery phase now brings the parties back before the Court.

On February 4, 2020, Plaintiffs served their First Requests for Production of Documents on the HMA Defendants. *See* Doc. No. 256-1. Defendants subsequently served their initial

1

responses to Plaintiffs' requests. *Id*. On July 6. 2020, Plaintiffs moved the Court for an Order compelling Defendants to fully respond to Plaintiffs' requests. *See* Doc. No. 140.

Magistrate Judge Cayer ruled on Plaintiffs' motion and held that "[t]he appropriate scope of discovery here is whether Plaintiffs participated in protected activities at Lake Norman Hospital and Davis Hospital, whether Defendants had knowledge of those activities, and whether Defendants wrongfully terminated Plaintiffs' contracts with those hospitals." Doc. No. 182. Magistrate Judge Cayer further ruled that "[w]here Plaintiffs are attempting to conduct discovery within that scope, their Motions to Compel are granted." *Id*. at 5. Each of the parties appealed certain aspects of Magistrate Judge Cayer's ruling.

This Court subsequently held a hearing on the scope of discovery, where the Court directed Defendants to provide a report to the Court relating to the number of search term hits following the running of search terms over emails collected from certain custodians. The parties tried to negotiate a resolution, but there was no understanding among the parties.

A second hearing was then held by the Court. There was further discussion related to the appropriate set of search terms and email custodians for the production by Defendants. The parties continued to negotiate following the hearing, and more status reports were submitted to the Court. Yet the parties could not resolve their differences.

On June 18, 2021, the Court entered an Order concerning the discovery disputes between the parties. Doc. No. 224. As for ESI and the production of emails, the Court ordered Defendants to run the most recent iteration of search terms, agreed to by both parties, against Defendants' existing databases and produce any non-privileged documents. *Id*. at 7. Additionally, the Court clarified that the scope of discovery "likely fall [] somewhere between that of only Division I hospitals and executives and an attempt to conduct discovery concerning the national investigation

by the DOJ involving more than sixty hospitals." *Id*. The Court cited the May 3, 2021, hearing where it stated that "the Court could envision discovery being limited to Division 1, as well as two or three other hospitals known and fairly well established to have had similar conduct occur (i.e., Carlisle, Summit, UMC-Lebanon)." *Id*. at 7 n. 6. However, the Court declined to provide a "specific ruling limiting the scope of all future discovery." *Id*. at 7. Consistent with the parties' obligations under the Federal Rules of Civil Procedure, the Court's Order specified that discovery was ongoing and that the parties' discovery obligations continued. *See id*. at 8.

Following the Court's Order, the parties continued with the discovery phase of this litigation. On May 6, 2022, Plaintiffs served Defendants with their Second Set of Interrogatories and their Second Set of Requests to produce documents. *See* Doc. No. 256-6,7. Defendants objected to Plaintiffs' requests and refused to provide any information or documents responsive to any of these requests.

Defendants have now moved for a protective order preventing Plaintiffs from seeking discovery beyond the Court's prior order and asking the Court to apply such order to Plaintiffs' second set of requests for production. Plaintiffs, along with their opposition to Defendant's motion, have moved to compel the production of certain requests for supplementation of their first set of discovery requests.

## II. LEGAL STANDARD

Parties are generally entitled to discovery regarding any non-privileged matter relevant to any claim or defense. Fed. R. Civ. P. 26(b)(1). When a party or person fails to respond to a discovery request, the party seeking discovery may move for an order compelling compliance. Fed. R. Civ P. 37(a). The party resisting discovery bears the burden of persuading the Court of the

3

legitimacy of its objections. *See, e.g.*, *Gaston v. LexisNexis Risk Sols., Inc.*, No. 5:16-CV-00009-KDB-DCK, 2020 U.S. Dist. LEXIS 40225, at *3-4 (W.D.N.C. March 9, 2020).

That said, discovery, "like all matters of procedure, has ultimate and necessary boundaries." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). To be discoverable, the requested information must be "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevance is not, on its own, a high bar; there may be a mountain of documents and emails that are relevant in some way to the parties' dispute, even though much of it is uninteresting or cumulative." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). Therefore, Rule 26 "imposes another requirement: discovery must also be 'proportional to the needs of the case.'" *Id.* The "proportionality requirement relieves parties from the burden of taking unreasonable steps to ferret out every relevant document." *Minyard v. Hooks*, 2019 WL 2502759, at *2 (W.D.N.C. June 17, 2019) (citing *Jordan*, 921 F.3d at 188). In determining proportionality, the Court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Accordingly, a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D). In deciding a motion for protective order, the district court has "substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).

### III. DISCUSSION

**A.** *Additional Documents Responsive to the First Set of Discovery Requests*

Plaintiffs request that Defendants supplement their responses to Plaintiffs' first set of discovery requests. Plaintiffs seek the following discovery:

> "(1) limited patient census, revenue and payor mix data kept at the Lake Norman and Davis Hospitals from 2008 to the present because it is needed by the Plaintiffs' damages expert for his damage calculations and should be readily available at these defendant hospitals; (2) compensation amounts for a limited number of HMA executives consisting of their offer letters and salary, bonus/incentive plan and bonus/incentive payments; (3) two compliance reports (and related documents) identified by date and author by Plaintiffs, one of which was produced to the Department of Justice ("DOJ"), that discuss investigations into admission fraud during the year the Plaintiffs were terminated, as well as HMA executives' knowledge and reaction to the same; (4) compliance logs, reports and investigative materials for relevant and specified admission fraud investigations only partially produced to date."

*See* Doc. No. 256.

Before turning to the merits of each request, the Court must clear up Defendants' mistaken belief that the Court's June 18, 2021, order limits Plaintiffs' ability to seek supplementation. The issue before the Court at that time was the scope of electronic discovery and what search terms should be run in the Defendants' Raw Data Universe ("RDU"). The Court ordered Defendants to run the most recent iteration of search terms, agreed to by the parties, against Defendant's existing databases and produce any non-privileged documents. *See* Doc. No. 224 at p.7-8. That said, the Court expressly refused to limit the scope of all future discovery, stating "the Court is unable on the present record to rule in advance on exactly where the line would be in all circumstances." *Id*. at 7. Consequently, Defendants cannot use the Court's previous order as a shield against Plaintiffs' requests for supplementation. Having remedied Defendants' confusion, the Court will now address the merits of each request.

> I. <u>Requests for: Payor and Census Data from Lake Norman and Davis from 2008 to Present; and Hotline Complaints, Compliance Department Investigation of These Complaints and Resulting Reports, Related Communications with HMA or EmCare Executives, and Monthly Compliance Operations Reports</u>

5

Plaintiffs ask for "a limited amount of the Lake Norman and Davis Hospitals' ER payor and patient census data from 2008 to the present date" to accurately calculate damages for multiple contract term renewals and for backpay purposes. *See* Doc. No. 256. Plaintiffs contend that this data is necessary because without it their damages calculations will be based on estimates of the patient payor mix and census data rather than the actual data. Plaintiffs insist the actual data will show their potential damages to be higher than their current calculations, which are based on their expert's estimations. Moreover, without the requested data, Plaintiffs surmise Defendants will claim their expert's damages calculations are inaccurate because it is based on estimated data rather than the actual data.[1]

Plaintiffs also seek hotline complaints, compliance department investigation of these complaints and resulting reports, related communications with HMA or EmCare executives, and monthly compliance operations reports. Plaintiffs have narrowed this request to the following complaints: (1) two complaints, one in-person and one hotline, lodged against Dr. Michael Wheelis, which were made in July 2008 and December 2009; (2) an Alertline complaint filed by Dr. Clifford Cloonan, an EmCare physician at the Carlisle Regional Hospital; (3) a hotline complaint filed by Pam Tahan, the HMA CEO for Summit Medical Center along with a few emails she forwarded to company counsel; and (4) an email sent by Dr. Mason complaining about Defendants pressuring Plaintiffs on admissions and their concern with revenue and not the quality of care of their patients. *See* Doc. No. 256, p. 17-20. Plaintiffs maintain the alleged culture of retaliation against emergency providers is essential to their claims. Therefore, the investigation into these complaints of ER admission pressure and retaliation, the interviews conducted, the

---

[1] Defendants represent to the Court that they will not cross-examine Plaintiffs' expert about his or her failure to analyze data that has not been produced. *See* Doc. No. 277 p. 7.

results of these investigations, the reporting of this information to HMA executives, and their reaction and actions taken upon learning of this information are vital to this case.

Defendants' response to these two requests are essentially the same. They maintain that these requests are overbroad, burdensome, seek information that does not exist, and seek documents that would have already been produced. Defendants assert that there is no centralized location where such documents are stored and thus there is no reasonable way to search for them. Defendants also contend the payor and census data from 2012 to present is not relevant to Plaintiffs' damages because Plaintiffs cannot recover fifteen years of lost profits. *See* Doc. No. 277 p.6.[2]

While Defendants are not obligated to create something that doesn't exist, they must make a good-faith effort to meet their discovery obligations. *See* Fed. R. Civ. P. 26*; All Risks Ltd. v. Crump Ins. Servs.,* No. 10-1554, 2012 U.S. Dist. LEXIS 105366, at *3 (D. Md. July 26, 2012 ("a party is not required to create documents, and reports, etc. that do not exist."). Fulfilling discovery obligations "requires much more than simply going through the motions. It requires, among other things, a true effort to fully answer interrogatories, to produce relevant documents in a timely manner, and to properly conduct oneself during depositions." *Smith v. US Sprint*, No. 92-2153, 1994 U.S. App. LEXIS 3630, at *15 (4th Cir. Feb. 28, 1994) (unpublished). The Court recognizes that an extraordinary amount of discovery has already taken place, but Defendants cannot summarily deny these requests without any investigation. Defendants' counsel's speculation that

---

[2] The parties agree that, if a jury finds for them, Plaintiffs would be entitled "reasonably certain" future damages. *See* Doc. Nos. 256, 277; *see*, *e.g.*, *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 548-49 (M.D.N.C. 2002). However, in these motions and the parties' memoranda on damages, the parties disagree as to what constitutes "reasonably certain" damages. As the Court has noted, *see* Doc. No. 270, if this matter goes to trial it will ultimately be for the jury as the trier of fact to determine whether and to what extent Plaintiffs have proven their damages with reasonable certainty.

7

these documents do not exist is insufficient. Therefore, because these requests seek relevant discovery, Defendants must make a good-faith effort to produce the requested discovery. If after a good-faith investigation, Defendants determine these documents no longer exist, cannot be found, or are already in the RDU they need only affirmatively provide that response to the Plaintiffs. Of course, if they determine that the documents do exist then they must produce the requested documents if it is not unduly burdensome to do so.

II. <u>Compensation, Incentive Pay, and Bonus Payments for HMA Executives</u>

Plaintiffs request documents showing compensation information, incentive pay, and bonus payments for designated HMA executives at Lake Norman and Davis Hospitals, HMA Division I Regional Executives, and select HMA corporate executives between 2008 and 2012.[3] Plaintiffs assert that this information is needed to determine whether ER operations, including admission or testing benchmarks, were the subject of executive incentive or bonus pay. Plaintiffs argue this will go to "motives for conspiratorial and fraudulent conduct (including a motive for retaliating against or terminating Plaintiffs)." *See* Doc. No. 256 p. 11-12.

Apart from contending that no request covers this information, Defendants object to producing any offer letter, annual bonus plan, or evidence of payments under the bonus plan for individuals who could not have influenced the decision to terminate Plaintiffs. Defendants contend

---

[3] Plaintiffs state that the parties have exchanged a list of the following individuals: Gary Newsome (HMA CEO); Kelly Curry (HMA COO); Stan McLemore (HMA COO); Britt Reynolds (Div. I CEO); Angela Marchi (Div I VP); Chris Hilton (HMA CFO); Lynne West (HMA CNO); Ron Riner (HMA Medical Director); Michael Cowling (Lake Norman CEO); Greg Lowe (Lake Norman CEO); Todd Dixon (Lake Norman CFO); James Stoner (Lake Norman CFO); Karen Metz (Davis CEO); Andy Davis (Davis CEO); Kelly Conklin (Davis CEO); Kyle Johnson (Davis CFO); John Kristel (Div I Carlisle HMA CEO); Pam Tahan (Div I Summit CEO); Craig Walker (Chester CEO); and Michael Wheelis (EmCare and HMA Medical Director). *See* Doc. No. 256.

8

the documents concerning unrelated executives cannot be relevant in this action. And the Court agrees.

The incentive or bonus pay of unrelated executives is irrelevant and therefore Defendants will not be required to produce it. These unrelated executives were not involved in the termination decision and consequently their incentive or bonus pay could not have been a motive for Plaintiffs' termination. Accordingly, Defendants will only be required to produce information related to executives who were in the direct operational supervisory chain of individuals who could have influenced the decision to terminate Plaintiffs.

### III. The Matt Tormey and Paul Meyer Compliance Activity Reports and Related Documents

Plaintiffs seek two "compliance activity summary reports" that discuss fraud investigations prepared by the HMA Compliance Department. One is the report of Matt Tormey dated December 5, 2010, and the other is the report of Paul Meyer, dated August 19, 2010. Defendants contend that both reports are non-discoverable because they are privileged.

#### a. The Tormey Report

Plaintiffs assert three reasons why the Defendants should be compelled to produce the Tormey Report. First, the Defendants already produced an unredacted version of the Tormey Report to the DOJ and Plaintiffs were allowed to examine the contents of this report when they reviewed Defendants' production during the fraud investigation. Second, Defendants' privilege claim is incorrect. Mr. Tormey, even though he has a law degree, was the head of the corporate compliance department and in that role, he collected facts about compliance concerns. He never functioned as a lawyer, and he did not provide legal advice at any time. And lastly, even if the Tormey report was privileged, the Defendants waived any privilege when they produced this document to the DOJ.

Defendants insist the report is privileged and, even assuming Matthew Tormey was not acting as counsel, that the presence of a non-attorney in an investigation does not destroy work-product protection. *See, e.g.*, *Lively v. Reed*, No. 1:20 CV 119 MOC WCM, 2021 WL 664853, at *2 (W.D.N.C. Feb. 19, 2021) (noting that Rule 26(b)(3)(A) specifically contemplates the assistance of non-attorney investigators, consultants, and agents in creating work product). Defendants also maintain they have not waived work-product protection for the Tormey Report even if it was produced to the DOJ.

Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure states: "Ordinarily, a party may not discover documents . . . prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). Here, it is clear Tormey was a compliance officer who worked closely with the legal department and prepared this report to summarize an investigation by in-house counsel, with the assistance of outside counsel, into an alleged fraud that would likely be the subject of litigation. Because Defendants have asserted work-product privilege over the report, and not attorney-client privilege, the fact Tormey was not acting as an attorney is irrelevant by the plain text of the rule. Therefore, the Court finds that report is covered by the work-product privilege.

That said, the work-product privilege is not absolute and may be waived. *United States v. Nobles*, 422 U.S. 225, 239, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975). The waiver exception protects parties from adversaries who seek to use materials "as a sword and as a shield." *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988). However, the work-product privilege is not waived by mere disclosure but instead by making "testimonial use" of the protected material. *Wells*

*v. Liddy*, 37 F. App'x 53, 65 (4th Cir. 2002) (citing *Nobles*, 422 U.S. at 240 n.14; *FEC v. Christian Coalition*, 178 F.R.D. 61, 76 (E.D. Va. 1998) ("While the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege.")).

Plaintiffs argue Defendants waived privilege when they produced this document to the DOJ, citing to *In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 702 (4th Cir. 2020) ("appellant waived privilege over protected internal audit interviews because its disclosure to the government quoted from the interviews, and it waived privilege over protected internal notes and memoranda on the interviews because the disclosure 'summariz[ed] in substance and format the interview results.'") (citing *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988))[4]. However, this case is inapposite. In *In re Martin Marietta Corp,* Marietta submitted to the United States Attorney a Position Paper describing why the company should not face indictment, which contained information derived from privileged documents. *See* 856 F.2d 619, 623. As a result, the underlying details were no longer privileged. *Id*. In contrast, here Defendants only produced the report in response to a DOJ subpoena and entered into an agreement under which production of the privileged materials would not waive privilege. *See* Doc. No 277, p. 10*;* Doc. No. 277-2*.*

Generally, "the involuntary or compelled production of privileged or protected documents does not waive otherwise applicable claims of privilege so long as the privilege holder objects and take[s] reasonable steps to protect its claims of privilege and protection." *Krakauer v. Dish Network*, LLC, 2015 WL 12752731, at *2 (M.D.N.C. June 24, 2015) (quoting *Int'l Union of Operating Eng'rs, Local No. 132, Health & Welfare Fund v. Philip Morris*, 1999 WL 33659387,

---

[4] The quotation in Plaintiffs' brief from *In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 702 (4th Cir. 2020) is a description of *Marietta*, not a holding from *Flour*.

at *2 (S.D.W. Va. June 28, 1999)). Consequently, the Court finds that Defendants did not waive privilege when they produced the Tormey report because production was involuntary and Defendants took reasonable steps to protect their claim of privilege (i.e. entering into the non-waiver agreement with the DOJ).

      b. The Meyer Report

Plaintiffs argue the Meyer Report, which is a summary compliance memorandum, is relevant to this action because it details concerns about fraud reported to Defendants' legal department. Plaintiffs know Defendants have the report because as a condition of their settlement with Mr. Meyer, he had to surrender this memo. Moreover, when Defendants recovered the report, they were under criminal and civil investigations by the DOJ and had received a litigation hold letter from Plaintiffs' counsel. Therefore, this report should be in the Defendants' possession, custody, or control. However, Defendants maintain that the Meyer Report is protected under attorney-client privilege.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). The Fourth Circuit has adopted the "classic" test for determining the existence of the attorney-client privilege. *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam). The attorney-client privilege applies when: (1) "the asserted holder of the privilege" is a client, (2) "the person to whom the communication was made" is an attorney, (3) "the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing [legal advice or services], and not (d) for the purpose of committing a crime or tort," and (4) "the privilege has been (a) claimed and (b) not waived by the client." *In re Grand Jury Subpoena* No. 2013R00691-009, 201 F. Supp. 3d

767, 771–72 (W.D.N.C. 2016). If the privilege applies, confidential communications between lawyer and client are completely protected from disclosure. *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998).

A Florida state court has already considered this issue and found that the Meyer Report is protected by attorney-client privilege. *See* Doc. No. 277-1*, Ord. of Broward County Circuit Court in Meyer v. HMA*, No. 11-025334, at 7 (holding that the Meyer Report was privileged). And this Court agrees. Simply put, the report was created by Meyer, as an employee of the Defendants, under a policy that required him to notify in-house counsel of compliance issues for the purpose of obtaining legal advice. However, as Plaintiffs correctly point out, the Florida state court also found other documents related to Paul Meyer and his work for the Defendants were not privileged. *See id*. at 10-13. Therefore, the Court will order Defendants to produce any documents which the Florida state court determined not to be privileged and that are relevant to this case.

*B. Second Set of Interrogatories and Requests*

I. Information sought from similarly situated groups or hospitals to demonstrate pretext

In response to two of Plaintiffs' earlier interrogatories, Defendants asserted twelve non-retaliatory reasons for terminating Plaintiffs' contracts at Lake Norman and Davis Hospitals. *See* Doc. No. 251-5. Plaintiffs now pursue, through interrogatories 37–42[5] and document requests 49–

---

[5] The interrogatories are as follows: (37) seeks "the number of emergency department patients returning within 48 hours for each of the Other Relevant Hospitals on a weekly/monthly basis from January 1, 2008, through December 31, 2012."; (38) requests the patient satisfaction scores for emergency department physicians at each of the Other Relevant Hospitals on a weekly/monthly basis from January 1, 2008, through December 31, 2012. (39) requests the HMA Defendants to identify the average length of patient stay, or LOS, for the Other Relevant Hospitals during the same time period; (40) seeks the number of emergency department patients who left without treatment, or LWOT, from the Other Relevant Hospitals for the same time period; (41) seeks the number of emergency department patients who left against medical advice, or AMA, for the Other Relevant Hospitals; and (42) requests that the HMA Defendants identify each instance where they

13

53,[6] disparate treatment discovery from "Other Relevant Hospitals"[7] to demonstrate that these proffered non-retaliatory reasons are pretextual. Plaintiffs argue Defendants have a duty to identify the relevant facts that they are going to rely on in support of their defenses and to produce the requested information so that Plaintiffs may rebut these defenses.

Defendants respond that Plaintiffs have made no attempt to show how these groups were similarly situated and "even if those groups were similarly situated, that does not make the data requested relevant to refuting the HMA Defendants' stated reasons for termination." *See* Doc. No. 277 p.13-14. Defendants insist that the relevant issue concerning Plaintiffs' termination was their refusal to work with hospital administration on: (1) staffing the new Davis Regional emergency room; (2) implementing a new Fast Track initiative at Lake Norman; (3) implementing the new EMR system; and (4) improving upon the relevant statistics when needed. *See* Doc. No. 277 p. 14. However, Defendants' discovery responses suggest otherwise.

Defendants cannot assert these non-retaliatory reasons for terminating Plaintiffs' contracts and then, when the Plaintiffs ask for related discovery, deny their relevance. Plaintiffs are entitled

---

contend that a MEMA physician failed to abide by industry standards in its ER practices, including ACC-AHA and imaging guidelines and other industry standard testing practices.

[6]The request for documents are as follows: (49) documents showing patient satisfaction scores of emergency department physicians at the Other Relevant Hospitals during the time period of 2008-2012; (50) all medical staff surveys with satisfaction scores relating to emergency room physicians at the Other Relevant Hospitals during the same time period; (51) documents related to "inadequate emergency department staffing" by any physician group at the Other Relevant Hospitals and communications relating to complaints about this topic at these hospitals; (52) complaints and concerns relating to the implementation of the Pro-MED electronic medical record by any physician or physician staffing group at the Other Relevant Hospitals and during the above time period; (53) requests all documents and communications relating to the following statistics at the above hospitals for January 1, 2008, through December 31, 2012.

[7] The "Other Relevant Hospitals" consist of all hospitals in Division I plus UMC Lebanon, Summit Medical Center, Natchez Regional Medical Center, Munroe Regional Medical Center, Brooksville Regional Medical Center, Pasco Regional Medical Center, and Springhill Regional Medical Center. *See* Doc. No. 251.

to reasonable discovery to show that these asserted reasons are pretextual. Therefore, if Defendants intend to put on evidence of these defenses, they must produce the requested information. If Defendants withdraw any, or all, of the defenses, they need not produce documents related to the withdrawn defense or defenses. Failure to produce the requested discovery for a particular defense will result in Defendants being precluded from asserting, at trial or on a dispositive motion, that defense.[8]

II. <u>Request 48: All contracts or agreements between HMA or any Other Relevant Hospital and EmCare regarding the provision of emergency department physician staffing services or management or consulting services of any kind; and Request 54: Documents related to any negotiations, bidding, financial, or other analysis and chart reviews or audits between HMA and any third party regarding the contracts at Lake Norman Regional Medical Center or Davis Regional Medical Center</u>

Plaintiffs have limited Request 48 to the following documents during the period of January 1, 2008 through December 31, 2012: (1) bonus payments or incentive payments made by the HMA Defendants to EmCare and/or its physicians at the Other Relevant Hospitals which are based in whole or in part on achieving metrics related to ER admissions; (2) all ER and hospitalist contracts between the HMA Defendants and EmCare at the Other Relevant Hospitals; and (3) any agreements, and any pay records, relating to compensation paid by HMA to Dr. Michael Wheelis for his "chart reviews' and "consultative services" at HMA hospitals. Plaintiffs believe this information is probative of Defendants' improper motive for terminating them and replacing them with EmCare.

Through Request 54, Plaintiffs request documents and communications related to any negotiations, bidding, financial or other analysis, and chart reviews or audits, between Defendants

---

[8] Of course Defendants may continue to dispute that these hospitals are sufficiently similarly to Plaintiffs' situation at Lake Norman and Davis Regional (and therefore lack relevance to the disputed claims), but that must be argued on a dispositive motion or at trial.

15

and any third party, including EmCare and Apollo, about the contract to provide emergency department or hospital staffing services at Lake Norman or Davis Hospitals from 2008 until 2012.[9] Plaintiffs believe Defendants are likely to have these records in hard copy or electronic form and that these records were not loaded into the RDU. Plaintiffs therefore request that Defendants inquire at these hospitals as to what records they have.

Defendants maintain these requests seek information that would not be stored in a centralized location in the ordinary course of business, does not exist, or that has already been produced in the RDU. At oral argument, Defendants' counsel represented to the Court that he had already called Lake Norman and talked to the IT director, who stated that all documents had been sent and uploaded into the RDU. Consequently, Defendants believe all the data that was preserved in 2011 or 2012 at Lake Norman and Davis Regional is in the RDU.

Again, while Defendants are not obligated to create something that doesn't exist, they must make a good-faith effort to meet their discovery obligations. *See* Fed. R. Civ. P. 26*; All Risks Ltd. v. Crump Ins. Servs.,* No. 10-1554, 2012 U.S. Dist. LEXIS 105366, at *3 (D. Md. July 26, 2012) ("a party is not required to create documents, and reports, etc. that do not exist."). Therefore, if the requested documents are already uploaded into the RDU or do not exist then Defendants need only say that. Therefore, the Court will order Defendants to produce these documents or affirmatively answer the request that they are no longer in existence or that all relevant documentation is in the RDU.

III.  Requests 56: Discovery related to Punitive Damages

---

[9] Request 55 sought the same information except it requested documents from the Other Relevant Hospitals, all which EmCare operated. However, Plaintiffs have withdrawn this request and the Court will therefore grant Defendants' motion as to request 55. *See* Doc. No. 251 at p. 22.

16

Plaintiffs seek all financial statements and auditor's opinions of the financial statements of the Defendants from January 1, 2019, to the date of trial. Plaintiffs note that N.C. Gen. Stat. § 1D-35(2)(i) provides that "[i]n determining the amount of punitive damages . . . the trier of fact . . . [m]ay consider . . . [t]he defendant's ability to pay punitive damages, as evidenced by its revenues or net worth." Therefore, in determining punitive damages, Defendants' ability to pay, as evidenced by its current revenues and net worth, is relevant.

Defendants believe the meet and confer process on this issue is ongoing and contend that it would be better to allow that process to proceed than to rule on this request. However, Defendants argue that if the Court is inclined to consider this issue, the motion should be denied because: (1) the request for this information is premature, as Plaintiffs have not established their entitlement to punitive damages; and (2) the request as written would be overbroad even if Plaintiffs had established entitlement to punitive damages.

The Court agrees with Defendants that the request for their financial statements is premature. Courts routinely decline to require discovery into a defendant's revenues or net worth for purposes of punitive damages until after the entitlement to punitive damages has been established. *See, e.g.*, *Finch v. BASF Catalysts*, LLC, No. 1:16CV1077, 2018 WL 11401664, at *1 (M.D.N.C. Feb. 14, 2018) (deferring discovery on this issue until after the court has considered the viability of the punitive damages claim at summary judgment); *Taylor v. McGill Envtl. Sys. of N.C. Inc*., No. 7:13cv270, 2015 WL 1125108, at *8 (E.D.N.C. March 12, 2015) ("Plaintiff contends she has established a prima facie case for punitive damages and is entitled to discovery of the financial information sought.... However, the court finds that here such a determination is more appropriately made on the parties' fully developed motions for summary judgment on the issue of punitive damages."); *see also Blount v. Wake Elec. Membership Corp*., 162 F.R.D. 102,

105 (E.D.N.C. 1993) (permitting discovery if the issue of punitive damages survives summary judgment). As a result, the Court will decline to compel discovery on Defendants' ability to pay punitive damages at this time.

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for a Protective Order, (Doc. No. 243), is **DENIED in part and GRANTED in part**. Specifically:

    a. The request for a protective order concerning supplementation of Plaintiffs' first set of requests is **DENIED**, except as to the extent a request is limited in this Order;

    b. The request for a protective order concerning Plaintiffs' interrogatories 37–42, and requests for documents, 48-54, is **DENIED**;

    c. The request for a protective order concerning Plaintiffs' requests for documents, 55 and 56, is **GRANTED.**

2. Plaintiffs' Motion to Compel, (Doc. No. 255), is **DENIED in part and GRANTED in part**. Specifically:

    a. The motion to compel as to Plaintiffs' first set of requests is **GRANTED**, except as to the extent a request is limited in this Order;

    b. The motion to compel as to Plaintiffs' interrogatories 37–42, and requests for documents, 48-54, is **GRANTED**;

    c. The motion to compel as to Plaintiffs' requests for documents, 55-56, is **DENIED.**

**SO ORDERED ADJUDGED AND DECREED**.

Signed: September 22,

Kenneth D. Bell
United States District Judge