# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:10-CV-00472-KDB

| | |
|---|---|
| THOMAS L. MASON, et al., **Plaintiffs,** v. HEALTH MANAGEMENT ASSOCIATES, LLC, et al., **Defendants.** | **ORDER** |

This case stalks this Court's docket "like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad." *See Lamb's Chapel v. Center Moriches Union Free Sch. District*, 508 U.S. 384, 398–99 (1993) (Scalia, J., concurring in the judgment). Over the past thirteen years the parties have raised and contested every conceivable issue and acceded no ground; and still, there remains work to be done. So, although the finish line is in sight and the path yet to travel is much shorter, today is not the end of the road because the parties' remaining material factual disputes must be decided by a jury.

Most simply put, the parties have presented contradictory evidence on Plaintiffs' alleged protected activities, Defendants' knowledge and response to those activities, Defendants' motive for terminating Plaintiffs' contracts, and other issues pending before this Court. The Court will therefore deny Defendants' Motion for Summary Judgment, Doc. No. 358, and this matter will proceed to trial.

1

# I. FACTUAL BACKGROUND

This case is about the termination of Mid-Atlantic Emergency Associates, PLLC's ("MEMA") contracts at Mooresville Hospital Management Associates, LLC d/b/a Lake Norman Regional Medical Center ("Lake Norman") and Statesville HMA, LLC d/b/a Davis Regional Medical Center ("Davis").

In 2008, Gary Newsome became Health Management Associates'("HMA") CEO. After Newsome's appointment, HMA engaged in a formal and aggressive plan to improperly increase emergency room inpatient admission rates at all HMA hospitals including Lake Norman and Davis hospitals. These tactics included: (i) establishing mandatory company-wide ER admission rate benchmarks; (ii) requiring all HMA hospitals to use an electronic medical record ("EMR") called Pro-MED to track ER physicians' admissions statistics and reveal physicians failing to meet HMA's admission-related benchmarks; (iii) instituting daily "Flash Meetings" where HMA and hospital executives would pressure ER physicians about alleged "missed" admissions; (iv) implementing mandatory benchmarks for calls from ER physicians to the attending physician or the patients' primary care physician whose purpose was to "sell" admissions; and (v) using monetary bonuses to induce ER physicians to increase their admission rate. *See* Doc. No. 370-40 at Attach. A, ¶ 30(a)-(g).

Plaintiffs contend that they immediately resisted these initiatives and consulted legal counsel, who informed them that these benchmarks and tactics were illegal. When they refused to participate in this illegal scheme, Plaintiffs claim HMA executives pressured and coerced the CEOs at Lake Norman and Davis to replace MEMA with a group that would "play ball." HMA ultimately terminated MEMA's contracts at both Lake Norman and Davis without cause on May 3, 2010. Plaintiffs argue that this termination was due to their refusal to participate in and their

complaints about the ongoing fraudulent medical treatment and billing. In response, Defendants tell a different story. Defendants contend that Plaintiffs were intransigent on new corporate-wide initiatives, failed to properly staff the emergency room at Davis Hospital, and Dr. Mason's DUI conviction reflected poorly on Lake Norman Hospital. Consequently, Defendants argue that they had legitimate non-retaliatory reasons for Plaintiffs' termination.

Plaintiffs have asserted claims against the Defendants under the federal and North Carolina False Claims Acts as well as claims for tortious interference with contract, defamation, and a North Carolina Unfair and Deceptive Trade Practices Act violation. The Defendants have now moved for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Mod. Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id.*, (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential

3

element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

     Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining whether summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III. DISCUSSION

Defendants make several arguments in their Motion for Summary Judgment. Defendants argue that: (1) Plaintiffs did not engage in protected activity; (2) the decision makers were unaware of any alleged protected activity; (3) there is no causal link between the alleged protected activity and the termination; (4) they had legitimate reasons for terminating MEMA's contracts; (5) MEMA lacks standing to bring an FCA claim; (6) Plaintiffs have failed to adequately support their non-FCA claims; and (7) Plaintiffs cannot show any damages. The Court will address each in turn.

a. **Retaliation claims**[1]

The False Claims Act (FCA) provides that:

> "any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

31 U.S.C. § 3730(h)(1). To establish a viable FCA claim plaintiffs must show that: (i) they engaged in a protected activity; (ii) defendants knew about the protected activity; and (iii) defendants took adverse action against them as a result. *See United States ex rel. Cody v. Mantech Int'l Corp.*, 746 Fed. Appx. 166, 176 (4th Cir. 2018). In the absence of direct evidence of retaliatory intent, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249

---

[1] Plaintiffs have brought both federal and state law retaliation claims. North Carolina General Statute § 1-616(c) states that the North Carolina False Claims Act "shall be interpreted and construed so as to be consistent with the federal False Claims Act, 31 U.S.C. § 3729, et seq., and any subsequent amendments to that act." Therefore, this section applies to both claims.

(4th Cir. 2015). Under that framework, "a presumption of retaliation arises" once a plaintiff establishes a *prima facie* case of retaliation. *Cody,* 746 F. App'x at 176. The burden then shifts to defendants to show a "legitimate, non-retaliatory basis" for termination. *Id*. Once they do so, the burden would "shift [] back" to a plaintiff to "demonstrat[e] that [defendants'] purported nonretaliatory reasons were not its true reasons but were a pretext for discrimination." *Id*.

> i. MEMA's Standing to Bring an FCA Retaliation claim

The Court will first address Defendants' preliminary argument that MEMA lacks standing to bring an FCA Retaliation claim. Defendants argue that Congress did not give entities standing to bring retaliation claims under the FCA because they are not in "employment-like relationships." *See* Doc. No. 361. This argument, however, ignores the plain language of the FCA.

The FCA's anti-retaliation section provides:

> (h) Relief from retaliatory actions.—(1) In general.—*Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole*, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (emphasis added). The purpose of the FCA is to expose fraud that the government itself cannot easily uncover by encouraging private parties to report fraudulent conduct. *See U.S. ex rel. Rebushka v. Crane Co.*, 40 F.3d 1509, 1511 (8th Cir. 1994). Consistent with this purpose, Congress amended the FCA retaliation statute in 2009 "by omitting the word 'employee' as the only potentially culpable party, and adding 'contractor' or 'agent' to 'employee' as identifiers of a possible aggrieved party." *U.S. ex rel Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 323-24 (5th Cir. 2016); *see* Contractor, *Black's Law Dictionary* (11th ed. 2019) ("a person or company that agrees to do work or provide goods for another company.")

6

This expanded class of potential identifiers of fraud includes MEMA. *See Munson Hardisty, LLC v. Legacy Point Apartments*, LLC, 359 F. Supp. 3d 546, 558 (E.D. Tenn. 2019) (an LLC that was general contractor was proper FCA plaintiff)), *objection overruled*; *see also Simon v. Healthsouth of Sarasota Ltd. P'ship*, 2019 U.S. Dist. LEXIS 235430, *19–20 (M.D. Fla. Dec. 13, 2019). The statute is unambiguous, and the Court will not create an ambiguity by taking into consideration Defendants' preferred portion of the legislative history. *See United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) ("when the terms of a statute are clear, its language is conclusive and courts are 'not free to replace . . . [that clear language] with an unenacted legislative intent.'"). Put another way, "we are governed by laws, not the intention of legislators." *See Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S. Ct. 1562, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring in judgment) (describing the use of legislative history as the equivalent of "entering a crowded cocktail party and looking over the heads of the guests for one's friends"). Congress could have written the FCA to cover only individuals, but it did not. Accordingly, MEMA has standing to bring a claim under the FCA's anti-retaliation provision.

    ii.   Plaintiffs' Protected Activity

There are two types of protected activity: acts in furtherance of an FCA action and other efforts to stop one or more FCA violations. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200-01 (4th Cir. 2018) (citing 31 U.S.C. § 3730(h)(1)). Under the first category, courts consider whether a plaintiff's actions raised a "distinct possibility" of FCA litigation. *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). To meet this standard, a plaintiff need not file a *qui tam* suit; instead, the plaintiff need only investigate "matters that reasonably could lead to a viable FCA action." *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013) (quoting *Eberhardt v. Integrated Design & Const. Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)). The

7

second category of protected activity encompasses activities "motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." *Carlson v. DynCorp Int'l LLC*, 657 F. App'x. 168, 172 (4th Cir. 2016).

In the Defendants' telling, Plaintiffs merely complained about the implementation and efficiency of HMA's electronic medical record system and other corporate-wide initiatives. Defendants maintain that Plaintiffs only expressed verbal concerns and made "vague allegations" about fraud, which are not enough to establish protected activity. At this stage, however, Plaintiffs have forecast sufficient evidence for a jury to find they engaged in protected activity.

Dr. Greer and Dr. Folstad testified that they, and other MEMA physicians, regularly mentioned that they were concerned about the pressure to admit patients and used specific terms like "fraud and abuse," "medically unnecessary," and "inappropriate" at the daily Flash meetings. *See* Doc. Nos. 370-12, 370-14. Dr. Guise also testified that MEMA "repeatedly told admin that we will not admit patients who did not need to be admitted, nor would we order tests that weren't necessary, that we felt that was unethical and inappropriate." Doc. No. 370-15. Along with the testimony of these physicians, Michael Cowling, the former Lake Norman CEO, testified that Plaintiffs "had consulted with their legal counsel" and believed Defendants' plan to drive up admission rates in the ER was "not legally sound and it was illegal. And so, it was [Plaintiffs'] clinical judgment saying that if they followed that plan, they would be admitting patients that did not need to be admitted." *See* Doc. No. 370-10. This testimony, along with the other evidence offered by Plaintiffs, is enough to survive summary judgment on this element.

iii. Decision Makers' Notice of Protected Activity

An FCA plaintiff must show that the employer had actual notice of the protected activity. Determining if an employer had notice is "viewed from the employer's perspective and turns on

8

whether the employer is aware of the employee's conduct." *U.S. ex rel. Parks v. Alpharma*, Inc., 493 F. App'x 380, 388 (4th Cir. 2012) (quotation omitted). The employer must know that the employee is alleging "false or fraudulent conduct beyond a regulatory violation." *Skibo ex rel. United States v. Greer Lab'ys*, *Inc*., 841 F. App'x 527, 535 (4th Cir. 2021).

Defendants argue that they had no reason to know that MEMA was pursuing an FCA action or was attempting to stop an FCA violation. But again, Plaintiffs have forecast sufficient evidence to satisfy this element. On top of the testimony of Michael Cowling and the MEMA physicians, Plaintiffs have proffered an August 2009 email from Dr. Mason to Newsome (CEO of HMA), Linda Epstein (HMA in-house counsel), Britt Reynolds (CEO for Division I hospitals), Angela Marchi (Vice President of Operations for Division I hospitals), Greg Lowe (CEO of Lake Norman), and several others, including Lake Norman's Board of Directors, containing letters from various MEMA doctors raising concerns about potential fraud. This proffered evidence could lead a jury to conclude that Defendants were on notice of the Plaintiffs' protected activity.

iv. Causal link between the alleged protected activity and the termination

Defendants next claim that even if Plaintiffs can show they engaged in protected activity and Defendants knew about it, there is no evidence it was the "but for" cause of the termination. Specifically, Defendants argue that Dr. Mason's August 2009 email alleging fraud was over eight months before MEMA was terminated and that period is too long to infer causation. However, this argument misunderstands the temporal requirement. The date to use in analyzing temporal causation is when the employer decided to terminate the employee, not the actual termination date. *United States ex rel. Rose v. Select Rehab.*, LLC, 2023 U.S. Dist. LEXIS 60599 at *11 ("[employer] could have decided to terminate [plaintiff] earlier but waited to avoid the appearance of a link to the protected conduct. Whether there was a link is a factual determination[.]");

9

*Cookeville Reg'l Med.*, 2021 U.S. Dist. LEXIS 192916, at*57 (analyzing "when the decision to fire [plaintiff] was made" to determine temporal causation.). To do otherwise would permit employers to escape liability by simply waiting to issue the final retaliatory termination decision. This loophole would gut the statute's protections for whistle blowers. And so, the proper analysis looks at the broader context of the termination decision and not only the termination date.

Here, Plaintiffs have presented evidence that Defendants began discussing their termination as early as 2008 and that these discussions continued uninterrupted until MEMA's termination. *See* Doc. Nos. 370-10, 370-73. 370-92, 370-39, 370-15, 370-95, 370-55, 370-99, 370-62. And, as noted above, Plaintiffs have forecast evidence of protected activity other than the August 2009 email including Plaintiffs' allegedly constant questioning of the medical necessity of admissions at the daily Flash meetings. In fact, Dr. Little testified that Andy Davis threatened MEMA at every Flash Meeting he attended "if we don't improve our admission rate, that our contract is in jeopardy" and warned MEMA "you[r] contract is being questioned." Doc. No. 370-20. Dr. Hansen also testified that he was "badgered over the head" for two years during Flash Meetings and that HMA executives bullied MEMA through "repeated questioning [and] aggressive repetitive behavior." *See* Doc. No. 370-16. In short, there is evidence from which a jury could find that there was no break in the temporal nexus between Plaintiffs' repeated protected activity and the termination of MEMA's contracts.

v. Non-retaliatory reasons for termination

Having found that Plaintiffs have forecast sufficient evidence to establish a *prima facie* case of retaliation, the burden shifts to Defendants to offer non-retaliatory reasons for MEMA's termination. They have offered four: (1) HMA wanted its hospitals to implement an EMR for physician documentation, and MEMA resisted it; (2) Dr. Mason openly resisted Mr. Lowe's Fast

10

Track initiative at Lake Norman to treat lower acuity patients separately; (3) Dr. Mason was convicted of Driving under the Influence; and (4) MEMA failed to adequately staff the new Davis emergency room when it opened, despite several months' notice. *See* Doc. No. 361. Because Defendants' burden to offer legitimate non-retaliatory reasons for its adverse employment action is one of production, not persuasion, Defendants have met this burden. *See Hoyle v. Freightliner, LLC,* 650 F.3d 321, 336 (4th Cir. 2011).

      vi. Evidence of Pretext

After Defendants' production of legitimate non-retaliatory reasons for the termination the burden shifts back to Plaintiffs to prove, by a preponderance of the evidence, that the Defendants' proffered reasons were merely pretext for retaliation. And Plaintiffs have forecast sufficient evidence for a jury to find that Defendants' reasons were pretextual. Plaintiffs have presented evidence that they were not resistant to all EMRs (only ones used to perpetrate fraud), Defendants were unaware of Dr. Mason's DUI conviction at the time of the termination, and the alleged issues with staffing at Davis and Fast Track occurred after the termination decision had been reached. *See* Doc. No. 370-111, 370-95, 370-87, 370-93, 370-88. In sum, these material facts are genuinely disputed. Therefore, whose evidence is more persuasive must be decided by a jury and the Court will deny the Motion as to these grounds. *See Huang v. Univ. of Va.*, 896 F. Supp. 2d 524, 554 (W.D. Va. 2012) (denying summary judgment where "reasonable jurors could conclude that Defendants' stated rationales for their decision . . . were merely a pretext for otherwise retaliatory action").

 b. **<u>Plaintiffs' other claims</u>**

Defendants have also moved for summary judgment on Plaintiffs' claims for tortious interference with contract, defamation, and unfair and deceptive trade practices, arguing that all

11

these claims suffer from one or more legal defect. Plaintiffs respond that they have offered sufficient evidence from which a jury could find for them on each of these claims. The Court agrees.

First, Plaintiffs have presented sufficient evidence from which a reasonable jury can conclude that Defendants tortiously interfered with MEMA's contract by terminating its contracts in a retaliatory manner. To establish a claim for tortious interference with contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Boeing Co. v. Ten Oaks Mgmt.*, LLC, 2023 U.S. Dist. LEXIS 111796, *18 (W.D.N.C. June 28, 2023). Interference with contract can be justified if it is motivated by "a legitimate business purpose." *Id*. As a result, a non-outsider (officers, directors, shareholders, and other corporate fiduciaries) has a qualified privilege to interfere with contractual relations between the corporation and a third party." *Id.*; *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 351-352 (4th Cir. 1998) (internal quotations omitted). That said, a non-outsider's conduct is not privileged or justified if his motives are improper, "as when his acts are performed in his own best interest and adverse to that of his firm." *Albright v. Charlotte-Mecklenburg Bd. of Educ.*, No. 317-cv-4610, 2017 WL 6028362 (W.D.N.C. Dec. 5, 2017) (internal quotations omitted). Retaliation is an improper motive. *See MCI Constrs. V. Hazen & Sawyer, P.C.*, 405 F. Supp. 2d 621, 630 (M.D.N.C. 2005); *B.V.I. Inuds. v. Microsoft Corp.*, 1987 U.S. App. LEXIS 18745, *7-9 (4th Cir. Aug. 11, 1987). The parties have presented conflicting evidence on HMA's involvement and motive in terminating MEMA's contracts. *See* Doc. Nos. 361, 369. Whose evidence and testimony are more

persuasive must be presented to the jury and is not for this Court to decide at this stage of the proceedings. Therefore, this claim must proceed to trial.

Likewise, Plaintiffs' defamation claim must proceed to trial. To recover for defamation, a plaintiff must show that "defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 897 (N.C. Ct. App. 2002). Slander *per se* is a subset of defamation in which the defendant makes "an oral communication to a third party which amounts to," in relevant part, "an allegation that impeaches the plaintiff in his trade, business, or profession." *Id*. at 898. A defamation claim must "recount . . . the allegedly defamatory statement either verbatim or at least with enough specificity to allow the Court to decide if the statement is defamatory." *Blackburn v. Town of Kernersville*, 2016 WL 756535, at *11 (M.D.N.C. Feb. 25, 2016) (quotation omitted). Plaintiffs have offered testimony from Dr. Guise that Greg Lowe (CEO of Lake Norman) told approximately 25-30 physicians and medical staff in the medical community that MEMA's ER physicians were not good doctors, and that MEMA was terminated because of their failure to provide quality care. *See* Doc. No. 370-15. Plaintiffs have also projected testimony that this statement was false, and that the audience included individuals from the medical community outside the HMA network and employees who were "distinct and independent of the process by which the statements were produced." *See* Doc. Nos. 370-15, 370-23, 370-65; *Sirona Dental, Inc. v. Smithson*, 2016 U.S. Dist. LEXIS 43529, *8–9 (W.D.N.C. Mar. 31, 2016) (holding that a company's president's communications to company executives were published because the president did not use the "executives' services in formulating" the communications). This is enough to survive summary judgment.

13

Lastly, Plaintiffs' unfair and deceptive trade practices claim also survives. To establish a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, a plaintiff must show: (i) the defendant committed an unfair or deceptive act or practice; (ii) in or affecting commerce; (iii) proximately causing injury to the plaintiff. *See Rector v. Nirvana Extractions, LLC*, 2023 U.S. Dist. LEXIS 132419, *18* (W.D.N.C. July 31, 2023). An act is deceptive "if it has a tendency or capacity to deceive" and unfair if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *See Sunbelt Rentals, Inc. v. Second Life Equip*., LLC, 2022 U.S. Dist. LEXIS 44816, *13 (W.D.N.C. March 14, 2022). The term "commerce" is defined broadly to include "all business activities, however denominated . . .." N.C. Gen. Stat. § 75-1.1(b). "Business activities" are "the manner in which businesses conduct their regular, day-to-day activities, or affairs, . . . or whatever other activities the business regularly engages in and for which it is organized." *See Sunbelt Rentals, Inc.,* 2022 U.S. Dist. LEXIS 44816, *14. Defendants argue that Plaintiffs have failed to establish any predicate offense and even if they have, none of the predicate offenses occurred in or affecting commerce. Defendants are mistaken. MEMA and Defendants were engaged in business activities through their agreement for MEMA to provide ER services at Lake Norman and Davis hospitals. Therefore, Defendants' allegedly constant pressure on MEMA to commit fraud, wrongful termination of MEMA, and replacement of MEMA with another physicians group affected commerce, as broadly defined in the statute. In sum, a jury could find for Plaintiffs on this claim as well. [2]

---

[2] While the Court will permit this claim to proceed to trial, it notes an apparent incongruity between Plaintiffs' FCA claim and their UDTPA claim. Generally, there is a presumption against UDTPA claims as between employers and employees. *Dalton v. Camp*, 353 N.C. 647, 658, 548 S.E.2d 704, 711 (2001). In an employment context, a claimant must make a showing of business-related conduct that is unlawful or of deceptive acts that affect commerce beyond the employment relationship. *Gress v. Rowboat Co.,* 190 N.C. App. 773, 776 (2008). Here, it appears Plaintiffs

14

Case 3:10-cv-00472-KDB  Document 384  Filed 08/16/23  Page 14 of 16

### c. **Plaintiffs' Provable Damages**

Finally, Defendants argue that summary judgment is appropriate on all claims because Plaintiffs cannot prove any damages. While conceding that proof of damages is not required to sustain an FCA retaliation claim, Defendants claim that it is required to award Plaintiffs any monetary damages, as the FCA is compensatory. Defendants consequently conclude that without a cognizable damages theory and evidence to support it, Plaintiffs are limited to their claims for equitable relief under the state and federal FCAs and nominal damages for slander *per se*. Alternatively, Defendants argue that MEMA cannot recover damages for those who did not work at Lake Norman or Davis hospital.

Under 31 U.S.C. § 3730(h) and N.C. Gen. Stat. § 1-613, Plaintiffs are entitled to "all relief necessary to be made whole," including "reinstatement with the same seniority status that the employee, contractor or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees." Doc. No. 67 at ¶¶ 209, 216. Plaintiffs also seek similar compensatory damages, exemplary and punitive damages, attorneys' fees, and costs on their remaining state-law claims. *Id*. at p. 63.

At this time, Plaintiffs have shown that a jury could find that they suffered *some* damages. Even setting aside Dr. Royster's Report on Plaintiffs' economic damages[3], Plaintiffs have offered testimony on damages including special damages, which are mandatory under the FCA. *See* 31

---

contend they were in an "employment-like" relationship with Defendants for the FCA claim but were not in such a relationship for the UDTPA claim.

[3] The Court will rule on Defendants' Motion in Limine as to Dr. Royster's Report and the proper scope of evidence concerning economic damages at the appropriate time. Again, the parties are reminded that the Court intends to appropriately limit the evidence and issues on the question of damages so as to prevent improper speculation by the jury.

U.S.C. 3730(h) (relief . . . shall include . . . compensation for any special damages sustained as a result of the discrimination"); *Jones v. Southpeak Interactive Corp*., 777 F.3d 658, 672 (4th Cir. 2015) ("Every federal circuit court to have addressed the issue has concluded that the False Claims Act affords noneconomic compensatory damages."); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd*., 277 F.3d 936, 944 (7th Cir. 2002) (stating that the allowance for special damages in 31 U.S.C. § 3730(h) "permits recovery for emotional distress"). As shown through the testimony of several MEMA physicians, Plaintiffs intend to present evidence of reputational harm, hardship, annoyance, and discomfort to support an award of damages. *See* Doc. Nos. 370-4, 370-3, 370-5, 370-6, 370-7, 370-13, 370-30. Summary judgment would thus be inappropriate on the issue of provable damages.[4]

## IV. ORDER

**IT IS THEREFORE ORDERED THAT** Defendants' Motion for Summary Judgment, Doc. No. 358, is **DENIED.**[5] This case will proceed to trial absent a voluntary resolution among the parties.

**SO ORDERED**

Signed: August 16, 2023

Kenneth D. Bell
United States District Judge

---

[4] Alternatively, Defendants argue that MEMA cannot recover damages for those who did not work at Lake Norman or Davis hospital. As already noted, the Court will decide the proper scope of Plaintiffs' damages evidence at the appropriate time.

[5] The Court will also deny Defendants' Motions to Strike, (Doc. Nos. 374, 379), as moot. The Defendants may raise evidentiary objections as to the disputed testimony and expert reports, if appropriate, in a motion in limine or at trial.